Raymond F. Schuster, Appellee, v. International Association of Machinists, Auto Mechanics Lodge No. 701 et al., Appellants.

Gen. No. 39,755.

Opinion filed December 31, 1937. Re-hearing denied January 12, 1938.

Ross & BERCHEM, of Chicago, for appellants.

OTTO A. JABUREK, of Chicago, for appellee; FRANK C. JABUREK, of counsel.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This appeal by defendants, International Association of Machinists, Auto Mechanics Lodge No. 701, a voluntary association, Don M. Burrows and Frank Carroll, seeks to vacate an order for a temporary injunction entered upon the amended complaint of Raymond Schuster, plaintiff, restraining said defendants, in effect, from peacefully picketing plaintiff's place of business.

The amended complaint alleged substantially that plaintiff was and is "engaged in the business of operating and conducting a Ford automobile sales agency and service station at 3704 South Western avenue, Chi-

cago''; that plaintiff owns said premises, has $60,000 invested in his business. and his ''annual business amounts to approximately . . . $200,000''; that this controversy concerns four automobile mechanics and two mechanics' helpers employed by plaintiff; that plaintiff is not involved in any dispute with these employees over the terms and conditions of their employment and that his relations with them are pleasant and harmonious; that plaintiff has always operated his business on the open shop basis; that defendant union is a voluntary association of approximately 1,000 automobile mechanics and helpers employed in Chicago, and is affiliated with and part of the International Association of Machinists; that defendants Don M. Burrows and Frank Carroll are representatives and organizers or business agents for said union; that March 15, 1937, defendant Carroll told plaintiff that he would ''like to organize the shop'' by having plaintiff's mechanics and helpers become members of defendant union; that plaintiff invited Carroll to solicit his mechanics and helpers to join said union, but Carroll refused to do so, saying that he had already talked to them but had been unsuccessful in his effort to persuade them to become members of the union; that plaintiff told Carroll at that time ''that possibly the terms and conditions of employment under which said mechanics and helpers were employed were more satisfactory to them than the terms and conditions under which the members of said defendant union were employed''; that Carroll then said ''that he did not care about that . . . that said mechanics and helpers employed by·plaintiff had to get into the union and that if they failed or refused to do so, said defendant union would institute a system of picketing of plaintiff's said place of·business''; that on the following day, March 16, 1937, defendant John Doe and another stranger ''instituted a system of picketing of plaintiff's said

place of business, which picketing is still in progress and has been and is now being carried on each working day between the hours of 8:00 o'clock a. m. and 5:00 o'clock p. m.''; that the men engaged in the picketing relieve one another, only one of them at a time being on duty, walking slowly upon the public sidewalk in front of plaintiff's place of business; that "said pickets carry and display signs upon their chests and backs, approximately 20 by 30 inches in size,'' which bear the following inscription: "THIS GARAGE UNFAIR TO ORGANIZED LABOR AUTOMOBILE MECHANICS UNION LOCAL 701 A. F. OF L.''; that during the week of June 20, 1937, defendant Burrows demanded that plaintiff compel his mechanics and helpers to join the defendant union, which plaintiff refused to do; that "defendant union and said individual defendants and pickets have unlawfully joined and conspired together to interfere with and injure plaintiff in the operation of his said place of business for the sole purpose of compelling plaintiff to force his . . . automobile mechanics and helpers against their will to join . . . defendant union or else discharge them, by causing plaintiff's said place of business to be picketed, patrolled and boycotted, and by inducing and influencing those who are or who are about to become patrons of plaintiff to cease patronizing or not to patronize plaintiff''; that "it is the intention of said defendant union, said individual defendants and pickets, to continue said picketing, patrolling and boycotting of plaintiff's said place of business until plaintiff complies with the demands of said defendant union, as aforesaid, or until plaintiff is ruined and is forced to cease doing business''; that "plaintiff's patrons have and will continue to withhold patronage because of said picketing, patrolling and boycotting''; that plaintiff has no adequate remedy at law; and that he will suffer irreparable loss and injury unless relief is granted him by a court of equity. The complaint

concludes with the prayer that a temporary injunction be issued immediately and that upon a final hearing a permanent injunction issue restraining defendants from picketing plaintiff's place of business.

The allegation of fact in plaintiff's amended complaint upon which relief is sought, as distinguished from the inferences and conclusions averred therein, are briefly that the machinists and machinists' helpers employed by plaintiff are not members of defendant union; that they are satisfied with the terms and conditions of their employment and do not desire to join said union; and that because of plaintiff's refusal to enter into an agreement with the union to employ only its members, defendants have instituted a system of peacefully picketing his place of business, under which one man and only one man at a time walks upon the public sidewalk in front of his premises carrying a sign or placard on his "chest and back" bearing the legend heretofore set forth.

On plaintiff's motion based on the allegations of his amended complaint, filed July 6, 1937, after notice to defendants and arguments of counsel for the parties, an order for a temporary injunction was entered by the court July 8, 1937, restraining defendants—

"1. From picketing, or maintaining any picket or pickets, at or near the place of business of plaintiff located at 3704 South Western Avenue, Chicago, Cook County, Illinois;

"2. From patrolling in front, or in the vicinity, of plaintiff's said place of business in furtherance of such picketing;

"3. From exhibiting, or causing to be exhibited, any sign, placard or other matter at or near plaintiff's place of business, characterizing plaintiff as unfair to organized labor and designed to induce or influence, or which has the effect of inducing or influencing persons not to patronize the plaintiff;

"4. From advising, encouraging, or assisting in the doing of any of the things which are herein forbidden."

The major question presented on this record is whether organized mechanics may peaceably patrol a public sidewalk in front of a place of business with a sign or signs informing those interested enough to read same that the owner of such place of business, who had previously refused to enter into an agreement to operate a closed shop with a union comprising men of the same craft as his employees, is "unfair" to their union.

It is true that for many years, when essentially different views were entertained by the courts of this and some other jurisdictions than are now entertained concerning the relative rights of capital and labor, it was held to be the law of this State that even peaceful picketing was unlawful. However, since the enactment in 1925 of the Illinois Anti-Labor-Injunction Act (ch. 22, ¶ 58, Ill. State Bar Stats. 1935; Jones Ill. Stats. Ann. 106.21) and the decision of our Supreme Court in *Fenske Bros. v. Upholsterers' Union*, 358 Ill. 239, declaring that act constitutional, "peaceful picketing and peaceful persuasion" are no longer unlawful in this State or the proper subject of injunctive relief. But plaintiff urges that the holding in the *Fenske* case is only applicable where there is a labor dispute and that there is no labor dispute between plaintiff and defendants within the contemplation of our anti-injunction statute since the defendants are third parties or outsiders and the act comprehends only disputes "concerning terms and conditions of employment" where an employer-employee relationship exists.

The Illinois Anti-Labor-Injunction Act provides as follows: "No restraining order or injunction shall be granted by any court of this State, or by a judge or the judges thereof in any case involving or growing

out of a dispute concerning terms or conditions of employment, enjoining or restraining any person or persons, either singly or in concert, from terminating any relation of employment or from ceasing to perform any work or labor, or from peaceably and without threats or intimidation recommending, advising, or persuading others so to do; or from peaceably and without threats or intimidation being upon any public street, or thoroughfare or highway for the purpose of obtaining or communicating information, or to peaceably and without threats or intimidation persuade any person or persons to work or to abstain from working, or to employ or to peaceably and without threats or intimidation cease to employ any party to a labor dispute, or to recommend, advise, or persuade others so to do."

While our statute does not define a labor dispute with the particularity that a labor dispute is defined in the Norris-LaGuardia Act (U. S. Code Ann. Title 29, secs. 101–115) enacted by the congress of the United States March 23, 1932, it would not be an unreasonable construction of the Illinois act to hold that the legislature of this State intended by its enactment to prohibit the restraint of peaceful picketing in a situation such as is presented here, where a labor union by peaceful persuasion is seeking to secure an agreement with the employer to operate a "closed" or union shop and to persuade his employees to become members of the union.

Subsection (b) of sec. 13 of the Norris-LaGuardia Act provides as follows:

"A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any

association composed in whole or in part of employers or employees engaged in such industry, trade, craft or occupation.'' This section of said act specifically extends its benefits to a labor union and its representatives seeking by lawful means to increase the membership and prestige of such union. Under the public policy of the government of the United States as declared by the Norris-LaGuardia Act a labor union and its representatives attempting to unionize an ''open'' shop are included among those persons and associations which the federal courts are prohibited from enjoining from peaceful picketing. While it is the province of each State to formulate its own public policy as to what shall constitute a labor dispute and as to what may lawfully be done by the parties participating therein in their endeavor to achieve their respective aims, no sound reason is advanced why the public policy of this State as to the matter under consideration should not be in accord with the public policy of the federal government since peaceful picketing with signs such as were used here does not constitute an invasion of the liberty of plaintiff as guaranteed by the Constitution of the United States or of this State as will hereafter be shown. So long as it is now the established law of this State that restraint of peaceful picketing is prohibited in labor disputes where the employer-employee relationship exists, does it not logically and reasonably follow that a union which is engaged in an attempt to persuade an employer to employ only members of the union, shall upon the refusal of the employer to comply, be entitled to peaceably picket such employer's premises?

In *Senn v. Tile Layers Protective Union, Local No. 5,* 57 Sup. Ct. 857, in an opinion written by Justice Brandeis and filed May 24, 1937, the Supreme Court of the United States, affirming the decision of the Supreme Court of Wisconsin, said at pp. 859–864:

"The trial court found the following facts:

"The journeymen tile layers at Milwaukee were, to a large extent, members of Tile Layers Protective Union, Local No. 5, and the helpers, members of Tile Layers Helpers Union, Local No. 47. Senn was engaged at Milwaukee in the tile contracting business under the name of 'Paul Senn & Co., Tile Contracting.' His business was a small one, conducted in the main, from his residence, with a showroom elsewhere. He employed one or two journeymen tile layers and one or two helpers, depending upon the amount of work he had contracted to do at the time. But, working with his own hands with tools of the trade, he performed personally on the jobs much work of a character commonly done by a tile layer or a helper. Neither Senn, nor any of his employees, was at the time this suit was begun a member of either union, and neither had any contractual relations with them. Indeed, Senn could not become a member of the tile layers union, since its constitution and rules require, among other things, that a journeyman tile setter shall have acquired his practical experience through an apprenticeship of not less than three years, and Senn had not served such an apprenticeship.

". . .

"Because of the peculiar composition of the industry, which consists of employers with small numbers of employees, the unions had found it necessary for the protection of the individual rights of their members in the prosecution of their trade to require all employers agreeing to conduct a union shop to assent to the following provision:

" 'Article III. It is definitely understood that no individual, member of a partnership or corporation engaged in the Tile Contracting Business shall work with the tools or act as Helper but that the installation of all materials claimed by the party of the second part

as listed under the caption ''Classification of work'' in this agreement, shall be done by journeymen members of Tile Layers Protective Union Local #5.'

''The unions endeavored to induce Senn to become a union contractor; and requested him to execute an agreement in form substantially identical with that entered into by the Milwaukee contractors who employ union men. Senn expressed a willingness to execute the agreement provided article III was eliminated. The union declared that this was impossible; that the inclusion of the provision was essential to the unions' interests in maintaining wage standards and spreading work among their members; and, moreover that to eliminate article III from the contract with Senn would discriminate against existing union contractors, all of whom had signed agreements containing the article. As the unions declared its elimination impossible, Senn refused to sign the agreement and unionize his shop. Because of his refusal, the unions picketed his place of business. The picketing was peaceful, without violence and without any unlawful act. The evidence was that the pickets carried one banner with the inscription 'P. Senn Tile Company is unfair to the Tile Layers Protective Union,' another with the inscription 'Let the Union tile layer install your tile work.' . . .

''The question for our decision is whether the statute, as applied to the facts found, took Senn's liberty or property or denied him equal protection of the laws in violation of the Fourteenth Amendment. Senn does not claim broadly that the Federal Constitution prohibits a state from authorizing publicity and peaceful picketing. His claim of invalidity is rested on the fact that he refused to unionize his shop solely because the union insisted upon the retention of article III. He contends that the right to work in his business with his own hands is a right guaranteed by the Fourteenth Amendment and that the state may not authorize

unions to employ publicity and picketing to induce him to refrain from exercising it.

"The unions concede that Senn, so long as he conducts a nonunion shop, has the right to work with his hands and tools. He may do so, as freely as he may work his employees longer hours and at lower wages than the union rules permit. He may bid for contracts at a low figure based upon low wages and long hours. But the unions contend that, since Senn's exercise of the right to do so is harmful to the interests of their members, they may seek by legal means to induce him to agree to unionize his shop and to refrain from exercising his right to work with his own hands. The judgment of the highest court of the state establishes that both the means employed and the end sought by the unions are legal under its law. The question for our determination is whether either the means or the end sought is forbidden by the Federal Constitution.

". . . Clearly the means which the statute authorizes—picketing and publicity—are not prohibited by the Fourteenth Amendment. Members of a union might without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution. The state may, in the exercise of its police power, regulate the methods and means of publicity as well as the use of public streets. If the end sought by the unions is not forbidden by the Federal Constitution, the state may authorize working men to seek to attain it by combining as pickets, just as it permits capitalists and employers to combine in other ways to attain their desired economic end. The Legislature of Wisconsin has declared that 'peaceful picketing and patrolling' on the public streets and places shall be permissible 'whether engaged in singly or in numbers' provided this is done 'without intimidation or coercion' and free from 'fraud, violence, breach of the peace, or

threat thereof.' The statute provides that the picketing must be peaceful; and that term as used implies not only absence of violence, but absence of any unlawful act. It precludes the intimidation of customers. It precludes any form of physical obstruction or interference with the plaintiff's business. It authorizes giving publicity to the existence of the dispute 'whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be'; but precludes misrepresentation of the facts of the controversy. . . . Inherently, the means authorized are clearly unobjectionable. In declaring such picketing permissible, Wisconsin has put this means of publicity on a par with advertisements in the press.

"The state courts found that the unions observed the limitations prescribed by statute. The conduct complained of is patrol with banners by two or four pickets. Compare American Steel Foundries v. City Central Trades Council, 257 U. S. 184, 207, 42 S. Ct. 72, 77, 66 L. Ed. 189, 27 A. L. R. 360. The picketing was peaceful. The publicity did not involve a misrepresentation of fact; nor was any claim made below that relevant facts were suppressed. Senn did not contend that it was untruthful to characterize him as 'unfair,' if the requirement that he refrain from working with his own hands was a lawful one. He did not ask that the banners be required to carry a fuller statement of the facts. Compare American Furniture Co. v. I. B., etc., Chauffeurs, etc., General Local No. 200, 222 Wis. 338, 340, 347, 268 N. W. 250, 251, 255, 106 A. L. R. 335. Moreover, it was confessedly open to Senn to disclose the facts in such manner and in such detail as he deemed desirable, and on the strength of the facts to seek the patronage of the public. . . .

"In the present case the only means authorized by the statute and in fact resorted to by the unions have been peaceful and accompanied by no unlawful act. It follows, that if the end sought is constitutional—if the

unions may constitutionally induce Senn to agree to refrain from exercising the right to work in his business with his own hands, their acts were lawful.

". . . The end sought by the unions is not unconstitutional. Article III, which the unions seek to have Senn accept, was found by the state courts to be not arbitrary or capricious, but a reasonable rule 'adopted by the defendants out of the necessities of employment within the industry and for the protection of themselves as workers and craftsmen in the industry.' That finding is amply supported by the evidence. There is no basis for a suggestion that the unions' request that Senn refrain from working with his own hands, or their employment of picketing and publicity, was malicious; or that there was a desire to injure Senn. The sole purpose of the picketing was to acquaint the public with the facts and, by gaining its support, to induce Senn to unionize his shop. There was no effort to induce Senn to do an unlawful thing. There was no violence, no force was applied, no molestation or interference, no coercion. There was only the persuasion incident to publicity. As the Supreme Court of Wisconsin said:

" 'Each of the contestants is desirous of the advantage of doing business in the community where he or they operate. He is not obliged to yield to the persuasion exercised upon him by respondents. . . . The respondents do not question that it is appellant's right to run his own business and earn his living in any lawful manner which he chooses to adopt. What they are doing is asserting their rights under the acts of the Legislature for the purpose of enhancing their opportunity to acquire work for themselves and those whom they represent. . . . The respondents' act of peaceful picketing is a lawful form of appeal to the public to turn its patronage from appellant to the concerns in which the welfare of the members of the unions is bound up.'

"The unions acted, and had the right to act as they did, to protect the interests of their members against the harmful effect upon them of Senn's action. Compare American Steel Foundries v. Tri-City Central Trades Council, supra, 257 U. S. 184, 208, 209, 42 S. Ct. 72, 78, 66 L. Ed. 189, 27 A. L. R. 360. Because his action was harmful, the fact that none of Senn's employees was a union member, or sought the union's aid, is immaterial.

" . . .

"There is nothing in the Federal Constitution which forbids unions from competing with nonunion concerns for customers by means of picketing as freely as one merchant competes with another by means of advertisements in the press, by circulars, or by his window display. Each member of the unions, as well as Senn, has the right to strive to earn his living. Senn seeks to do so through the exercise of his individual skill and planning. The union members seek to do so through combination. Earning a living is dependent upon securing work; and securing work is dependent upon public favor. To win the patronage of the public each may strive by legal means. Exercising its police power, Wisconsin has declared that in a labor dispute peaceful picketing and truthful publicity are means legal for unions. It is true that disclosure of the facts of the labor dispute may be annoying to Senn even if the method and means employed in giving the publicity are inherently unobjectionable. But such annoyance, like that often suffered from publicity in other connections, is not an invasion of the liberty guaranteed by the Constitution. . . . It is true, also that disclosure of the facts may prevent Senn from securing jobs which he hoped to get. But a hoped-for job is not property guaranteed by the Constitution. And the diversion of it to a competitor is not an invasion of a constitutional right.

"It is contended that in prohibiting an injunction the statute denied to Senn equal protection of the laws, and Truax v. Corrigan, supra, is invoked. But the issue suggested by plaintiff does not arise. For we hold that the provisions of the Wisconsin statute which authorized the conduct of the unions are constitutional. One has no constitutional right to a 'remedy' against the lawful conduct of another.''

While it is true that the Wisconsin Anti-Labor-Injunction Act under consideration in the *Senn* case is practically the same as the Norris-LaGuardia Act and includes the section thereof heretofore set forth, we think that the reasoning of the United States Supreme Court and the conclusions reached by it in the *Senn* case are equally applicable to the instant case. The question presented in the *Senn* case was whether the Wisconsin statute, as applied to the facts found, "took Senn's liberty or property or denied him equal protection of the laws in violation of the Fourteenth Amendment" of the Constitution of the United States. It was definitely held in that case that in labor disputes "picketing and publicity are not prohibited by the Fourteenth Amendment." It follows, as stated in the opinion of Mr. Justice Brandeis, that this is true whether or not there is statutory authorization for such picketing and publicity. It has been heretofore pointed out that prior to the enactment of the Illinois Anti-Labor-Injunction Act peaceful picketing under any circumstances was held to be unlawful by our Supreme Court. However, a different rule prevailed in the federal courts and in many other jurisdictions.

In *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184, in passing upon the merits of a labor controversy and construing the Clayton Act, the court said at p. 203: "It is clear that Congress wished to forbid the use of the Federal courts of their equity arm to prevent peaceable persuasion by

employees, discharged or expectant, in promotion of their side of the dispute, and to secure them against judicial restraint in obtaining or communicating information in any place where they might lawfully be. *This introduces no new principle into the equity jurisprudence of those courts. It is merely declaratory of what was the best practice always. Congress thought it wise to stabilize this rule of action and render it uniform."* (Italics ours.)

Our Supreme Court quoted with approval in the *Fenske* case, *supra* (358 Ill. 239), the foregoing language from the opinion in the *American Steel Foundries* case, thereby indicating that it was not entirely in accord with the harsh and unfair rule formerly announced and followed in this State, that picketing in any event was unlawful. Even though it be held that the defendants are not parties to a labor dispute within the contemplation of our Anti-Labor-Injunction Act, wherein was their conduct unlawful? What they did was not in violation of plaintiff's constitutional rights and there is no statutory inhibition in this State against peaceful picketing and truthful publicity as employed by the labor union in this case. While the State of Illinois through legislative enactment may "in the exercise of its police power, regulate the methods and means of publicity as well as the use of the public streets," we fail to perceive how defendants' actions, which it must be conceded were "inherently unobjectionable," can be held to be unlawful even in the absence of statutory authorization, especially since the right of "peaceful picketing and peaceful persuasion" by a labor union has been recognized by the Supreme Court of this State. It was held in the *Senn* case that "one has no constitutional right to a 'remedy' against the lawful conduct of another."

Disregarding entirely for the moment the question as to whether our legislature in enacting the Illinois Anti-Injunction Act intended to restrict its application

to disputes concerning terms and conditions of employment where an employer-employee relationship existed, have not the defendants under the facts of this case the constitutional right through the medium of placards on the person of their peaceful picket or pickets to publish the truth concerning plaintiff's attitude toward organized labor? Members of a union may without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution. (*Senn v. Tile Layers Protective Union, Local No. 5, supra.*) It must be borne in mind in considering this question that it is conceded that during the entire course of the one man peaceful picketing there was no violence, threats, intimidation or coercion by the defendant union or its representatives. It must also be borne in mind that since plaintiff's employees were neither members of nor represented by any collective bargaining agency in their dealings with their employer, plaintiff was free under the National Labor Relations Act (U. S. Code Ann. Title 29, secs. 151–166) to agree with the defendants to operate a union shop.

While plaintiff complains about the presence of the pickets that alternated in front of his place of business, *his real complaint unquestionably is against the publicity given by the signs carried by them proclaiming the truth as to the unfairness of his attitude toward organized labor.* He persists in his refusal to deal with a labor union and yet he resents as an infringement of his rights the disclosure by that union to the public, including members of labor unions and their sympathizers, of his antagonism to organized labor. His position that, notwithstanding his antagonism to the union, the law must silence the voice of organized labor lest he may suffer any ill consequences as a result of his attitude, is untenable. It is, of course, his right and privilege to refuse to deal with the union and to operate a nonunion shop, but, in our opinion, it is just as

much the right and privilege of the union, when he so refuses, to publish the fact that it regards him as unfair to it. What inalienable right has an employer who is unfair in the eyes of organized labor to the favor of the continued patronage of its members and friends?

It has been repeatedly held that where an employer refuses to employ union labor, labor organizations may freely publish in their own official organs and other newspapers, in pamphlets or circulars, or by means of the radio, the fact that such employer is unfair to organized labor. Then, why is it not just as lawful for a labor union to make publication of the employer's unfairness by signs carried peaceably by a member or members of the interested union in the vicinity of the place of business of the employer?

It is a matter of common knowledge that many of our well known industrialists and large employers of labor almost daily condemn in the public press the alleged iniquities of organized labor. Costly means of publicity are available to them and they utilize their own publications, also magazines, newspapers and the radio to denounce labor unions and the principles they espouse. They go so far as to publicly proclaim with impunity that organized labor is inimical to and destructive of every principle of liberty guaranteed by the constitution. There is no legal means available to restrain such publicity. Yet when a labor union in a modest way, and utilizing perhaps the only means available which it can afford, seeks to present by signs carried on the person of one or more of its members the truth concerning an employer who refuses to recognize or deal with the union, it is strenuously urged that the employer is entitled to relief from a court of equity to prohibit the display of such signs in front of his place of business.

In the recent case of *Lietzman v. Radio Broadcasting Station, W. C. F. L.*, 282 Ill. App. 203, where the

facts were similar to the facts here except that the union involved in the dispute in that case used radio broadcasts instead of pickets with signs to publish the fact that the employer was unfair to organized labor, we said at pp. 215–220:

"In passing upon the right to 'freely speak, write and publish' as guaranteed by the constitution, in *Vulcan Detinning Co. v. St. Clair*, 315 Ill. 40, our Supreme Court used the following significant language, at pp. 46, 47:

" 'In construing this order it is proper to assume that the chancellor intended to enter an order in harmony with the constitution, which declares that "every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty." If the order in question is construed to mean that appellant and other members of the union cannot refer to the nonunion men employed by appellee as traitors, then any discussion had by the strikers among themselves, in their meeting place or elsewhere, or any publication they might make or notice they might give, could be considered a violation of the injunction. If a court of equity has the power to restrain and punish members of a labor union from speaking, writing or publishing on the subject of a dispute between the union and the employer, then the members of the labor union are not such persons as are within the quoted constitutional provision. If the right of a union man, or any other man, to speak, write and publish freely on any subject is abused to the harm of another the remedy is an action for damages, and that remedy is deemed adequate. If the public suffers injury because of a malicious publication the remedy is by a criminal action for libel. The guaranty of this section extends as fully to the poorest as to the wealthiest citizen of the State. Though an abuse of the liberty so guaranteed may result in loss for which there cannot be ade-

quate compensation, the American people believe that it is better that such be the result in isolated cases than that the liberty of speech be subject to the supervision of a censor.'

" . . .

"In discussing the right of a union or its members to endeavor by peaceful persuasion to induce members of the same craft to join their organization, and how far they may go in presenting their cause, in *Beck v. Railway Teamsters' Protective Union, supra* [118 Mich. 497], the court said at pp. 516, 517:

" 'So, also, the laborers have the right to fix a price upon their labor, and to refuse to work unless that price is obtained. Singly, or in combination, they have this right. They may organize in order to improve their condition and secure better wages. They may use persuasion to induce men to join their organization, or to refuse to work except for an established wage. They may present their cause to the public in newspapers or circulars, in a peaceable way, and with no attempt at coercion. If the effect in such case is ruin to the employer, it is *damnum absque injuria,* for they have only exercised their legal rights.'

"As to the union's right in a labor dispute to peaceably suggest and advise that an employer be not patronized, Justice Van Orsdel in his concurring opinion in *American Federation of Labor v. Buck's Stove & Range Co., supra* [33 Appeal Cases, Dist. of Col. 83], said at pp. 116, 121, 122–3:

" 'Applying the same principle, I conceive it to be the privilege of one man, or a number of men, to individually conclude not to patronize a certain person or corporation. It is also the right of these men to agree together, and to advise others, not to extend such patronage. That advice may be given by direct communication or through the medium of the press, so long as it is neither in the nature of coercion or a threat. . . .

" '. . . . It is not unlawful for citizens to organize together for any of the main purposes for which the American Federation of Labor exists. It is not unlawful for that order to have an official organ; it is not unlawful for that organization, through the medium of that organ, to express freely its opinion as to the fairness or unfairness with which certain employers deal with their employees; and it is not unlawful for the paper to contain advice to the friends of labor not to patronize such employer. Again, we do not assume that it will be contended that a citizen has not perfect freedom to deal with whom he pleases, and withhold his patronage for any reason that he may deem proper, whether the reason be one originating in his own conscience, or through the advice of a neighbor, or through the reading of an article in a paper. Neither would it be unlawful for such citizen to advise another not to deal with a person with whom he has concluded not to continue his patronage. If this advice may extend to one, it may to a hundred; and the thing done will not be actionable so long as it is an expression of honest opinion, and not slanderous, however much the intercourse between this citizen and his neighbors may operate to injure the person against whom the advice is directed. . . .

" 'No one doubts, I think the right of the members of the American Federation of Labor to refuse to patronize employers whom it regards as unfair to labor. It may procure and keep a list of such employers, not only for the use of its members, but as notice to their friends that the employers whose names appear therein are regarded as unfair to labor. This list may not only be procured and kept available for the members of the association and its friends, but it may be published in a newspaper or series of papers. To this extent they are within their constitutional rights; at least, where a court of equity cannot intervene. But, as soon as, by threats or coercion, they at-

tempt to prevent others from patronizing a person whose name appears on the list, it then becomes an unlawful conspiracy,—a boycott.' . . .

"While the case of the *American Foundries v. Tri-City Council*, 257 U. S. 184, dealt with a strike and held picketing in that case unlawful, the reasoning of the opinion in the case is especially applicable to the questions involved here. The court said at p. 209:

" 'Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighbor-

hood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without more, to be without excuse and malicious.' "

The foregoing decision and the cases cited therein recognized the fact that a single employee is helpless in dealing with his employer and that labor unions were lawfully organized out of the necessities of the situation to carry out their legitimate objects of securing and maintaining fair wages and conditions of employment. The Supreme Court of the United States in the *American Steel Foundries* case, *supra,* recognized the futility of an organization of employees that extended to only one or a few establishments in a community employing men of the same craft and held that those belonging to a labor union *"may use all lawful propaganda to enlarge their membership"* for the purpose of making their organization more effective.

Many and far reaching have been the changes in our social and legal concepts of the relative rights of labor and capital, and the trend of modern judicial and legislative thought is to recognize the right of any party or person participating or interested in a dispute between a labor union and an employer, over the unionization of the latter's shop, to give publicity by any lawful means available to the existence or the facts involved in such dispute.

It is not contended that defendants have the right through violence, coercion or other unlawful means to compel plaintiff to force his employees to join the union, but it is insisted that, since plaintiff had and has the right to sign an agreement with defendant union to employ only members thereof, defendants were privileged under the law when he refused to deal with them to publicize that fact as they did. As said in the *Senn*

case: "The sole purpose of the picketing was to acquaint the public with the facts and, by gaining its support, to induce Senn to unionize his shop." No rights of plaintiff's employees were infringed upon. If plaintiff had signed the agreement it would then have become a matter of choice with his employees whether they desired to continue to work for their employer by joining the union or whether they desired to leave his employment and seek work in some non-union shop.

There was neither mass picketing in this case nor physical or other interference with plaintiff, his employees or customers, and as heretofore said the picketing with signs was unaccompanied by threats, intimidation, violence, coercion or any unlawful act. Since a "closed shop" agreement and the publication of an employer's refusal to enter into such agreement are legal, and since the means employed to effect such publicity in this case were legal and the end sought was not an invasion of plaintiff's constitutional rights, it follows that the temporary injunction restraining defendants' peaceful picketing and truthful publicity was improvidently and erroneously granted. To hold otherwise and to deny defendants the legal rights they exercised in this case would be to discourage exemplary conduct on the part of organized labor.

Such other points as have been urged have been considered, but in the view we take of this cause we deem it unnecessary to discuss them.

For the reasons herein set forth the order entered by the superior court July 8, 1937, granting the temporary injunction to plaintiff is reversed.

*Order granting temporary injunction reversed.*

FRIEND, P. J., and SCANLAN, J., concur.