BLOSSOM DAIRY COMPANY *v.* INTERNATIONAL BROTHERHOOD
OF TEAMSTERS *et al.*

(No. 9336)

Submitted October 13, 1942. Decided December 8, 1942.

FOX, PRESIDENT, and KENNA, JUDGE, dissenting.

*Martin Bowles,* for appellant.
*Henry Sloman, Ritchie, Hill & Thomas* and *Charles
Ritchie,* for appellees.

Rose, Judge:

By the decree appealed from, the Circuit Court of Kanawha County awarded the Blossom Dairy Company an injunction against International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local No. 175, Frank Rebhan and Eugene Carter, and upon petition of the enjoined defendants, we granted this appeal.

The Blossom Dairy Company is a corporation. Its president and general manager is Sam Sloman. William Sloman, son of the president, is its secretary-treasurer and manager, and Henry Sloman, another son and attorney at law, is its vice-president and manager of the office and plant. This company, with its principal place of business at 116 Virginia Street in the City of Charleston began business in 1927, and conducts a business of "preparation, distribution and sale of milk and other dairy products at retail and wholesale, through six retail stores in Charleston and its vicinity and operates thirty motor vehicles for the delivery of its products over and along twenty-one routes" radiating about fifty miles from its place of business.

Until 1937, the company operated on a non-union basis. In May of that year, the drivers of these delivery vehicles, who also were salesmen and collectors, after protracted negotiations by union representatives, became members of the defendant, Local No. 175, an affiliate of the American Federation of Labor; and the employer, Blossom Dairy Company, then entered into a six months wage contract agreement with this local. As the agreement was about to expire, negotiations for a new contract were begun by the representatives of the union. At this point the Blossom Dairy Company employees belonging to Local No. 175 withdrew en masse from that union, formed themselves into an independent organization, since incorporated, as the "Brotherhood of Dairy Salesmen, Inc." The employer then promptly, and without notice of any kind to the former union, signed a contract with this newly organized group, which contract, with slight alterations, has been

renewed from time to time, the last renewal of which being still in effect. Upon the withdrawal of these employees from Local No. 175, the Blossom Dairy Company was placed on the "unfair list" by the Kanawha Valley Central Labor Union, an organization consisting of representatives of all the American Federation of Labor Union affiliates in the Kanawha Valley.

In May, 1941, an American Federation of Labor representative opened negotiations with the Blossom Dairy Company, through its president, with the purpose of obtaining a new contract, but was unsuccessful. Immediately thereafter, the defendants caused a single picket to be placed before each of four of the company's retail stores who carried placards with the inscription "Blossom Dairy Unfair to Organized Labor, Teamsters Local 175, Endorsed by Kanawha Valley Central Labor Union." This picketing was perfectly peaceable in every respect, and lasted only four hours. No disorder arose, and no customers absented themselves, so far as can be ascertained, and no contract between customers and the dairy company existed. About the same time, there appeared in "The Labor Union", a newspaper published under the legend "Official Publication of the American Federation of Labor Organizations In This Territory", a certain article stating that certain American Federation of Labor leaders in Charleston charged that the Brotherhood of Dairy Salesmen, Inc., was a "company" union, a "phony" union, and a "bogus" organization, and certain handbills were circulated throughout a part of the business territory of the Blossom Dairy Company criticising its labor policy.

Immediately, the Blossom Dairy Company presented to the Circuit Court of Kanawha County its bill for an injunction, which was based upon the allegation that the charge that it was "unfair to organized labor" and was dealing with a "company", "bogus", or "phony" union was false and tended to bring about a breach of its contract with the Brotherhood of Dairy Salesmen, Inc., and thus to cause irreparable injury to the plaintiff. An injunction, as prayed for, was awarded without notice to, or appear-

ance by, the defendants, whereupon the picketing immediately ceased.

By answer, the defendants deny that they were responsible for the article published in "The Labor Union", or the distribution of the handbills mentioned, but admit their responsibility for the picketing alleged; and assert that the statements published and disseminated by the handbills and borne on the placards of the pickets were truthful and published and displayed for a just end. Also, both by demurrer and answer, they defend upon the proposition that the injunction sought would violate the right of free speech and free press guaranteed the defendants by the First and Fourteenth Amendments to the Federal Constitution, and by Section 7, Article III of the Constitution of West Virginia. The demurrer was overruled, and evidence was taken at the bar of the court, at the conclusion of which, the court, by an oral opinion preserved in the record, announced that in his judgment it had not been shown that the Brotherhood of Dairy Salesmen, Inc., was not a bona fide organization, that its inception was sponsored by the plaintiff or by its responsible officials, or that its existence was dominated by them. The preliminary injunction was then perpetuated for the term of the contract then in force between the Blossom Dairy Company and the Brotherhood of Dairy Salesmen, Inc., inhibiting the defendants:

> "(1) From picketing the stores and places of business of the plaintiff, Blossom Dairy Company, a corporation, wheresoever located, or from persuading or attempting to persuade any person, persons, firms or corporations from purchasing plaintiff's products;

> (2) From publishing, or causing to be published statements designed to cause persons or prospective customers of plaintiff, at any of its stores, not to enter same, or to deal therein, or otherwise to boycott the plaintiff or plaintiff's stores wheresoever located;

> (3) From doing or performing any act designed and intended to induce plaintiff's employees to violate or attempt to violate the collective bar-

gaining contract now existing between the plain-. tiff and the Brotherhood of Dairy Salesmen, Inc., a corporation, during the existence of such contract, or inducing or attempting to induce the said Brotherhood of Dairy Salesmen, Inc., a corporation, to violate the terms of said contract."

The finding by the chancellor on the question of the bona fides of the Brotherhood of Dairy Salesmen, Inc., cannot be disturbed. A single former employee of the plaintiff, now discharged, testified that this independent union was organized, supported in part and dominated by Sam Sloman, the president of the plaintiff company. But Sam Sloman, one of his sons, the superintendent of the company, and five drivers and salesmen testify to the contrary. This finding, therefore, must be treated as a fact in the case. *Wright* v. *Goins,* 105 W. Va. 332, 142 S. E. 438; *Walton* v. *Pritt,* 93 W. Va. 375, 116 S. E. 759; *Baughman* v. *Hoffman,* 90 W. Va. 388, 110 S. E. 829; *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 838, 132 A. L. R. 1200. But, upon this fact thus ascertained and decreed and the other facts not in dispute, was the final order justified?

As to the published article and the distributed handbills, it was clearly wrong. There is no proof whatever that the defendants, or any of them, had anything to do with, or were in any way responsible for, these matters. As to the picketing, it will also be seen that the injunction was at least too broad in that it inhibits all picketing of the stores or places of business of the plaintiff, and not merely improper picketing. Thus a substantial modification, at least, of the injunction order is clearly required.

But may the decree be sustained for any purpose? With these modifications, there would remain simply an injunction against the carrying of banners by pickets with the inscription "Blossom Dairy Unfair to Organized Labor", whereas, the proof showed no ground or complaint whatever against this employer, except that it was under a labor contract with a local independent employees' union, against which no charges are made, except merely the fact that it was independent. The trial chancellor based

his decree largely, if not wholly, upon the fact, which he further found, that the picketing tended to bring about a breach of the contract between the company and this independent union. It is extremely doubtful if the plaintiff, on the evidence, has made a case for injunction, even on this ground. The contract, the breach of which is sought to be avoided, is between the Blossom Dairy Company and the Brotherhood of Dairy Salesmen, Inc., only. There are no other parties thereto. If it is a breach of this contract by the dairy company that is feared, shall a court be moved by the absurdity of a bill of complaint seeking an injunction to prevent third parties from inducing the plaintiff itself to breach the contract? If it is a breach by the Brotherhood of Dairy Salesmen, Inc., that is to be guarded against, we cannot forget that Sam Sloman, the president and controlling power in the dairy company, repeatedly says in his testimony that he is perfectly indifferent as to what union the company's employees belong to. If the plaintiff has no concern about this matter, why should a court issue an injunction at its request? The case pleaded by the plaintiff is thus largely neutralized by its president's testimony. Finally, there is not a word of testimony that there is any disposition on the part of a single employee belonging to the Brotherhood of Dairy Salesmen, Inc., to breach the contract in question.

It is not necessary, however, to base our decision solely upon an appraisal of this feature of the evidence. We think the law is against the plaintiff. True, it was once announced as law in this state that "Persons who conspire to induce others to break a valid contract between other persons are liable to action therefor, and if the loss occasioned thereby is continuing and irreparable, injunction will lie to prevent it." *Parker Paint and Wall Paper Company* v. *Local Union No. 813*, 87 W. Va. 631, 105 S. E. 911 (1921), 16 A. L. R. 222. But it is to be noted that the court was there dealing with a situation vastly different from what we have in the case at bar. That case involved secondary picketing, was accompanied by great violence, and did cause the breach of a number of business and commercial contracts between the employer and its cus-

tomers. The same doctrine had been applied directly to a contract between an employer and its employees by the Supreme Court of the United States in *Hitchman Coal & Coke Company* v. *Mitchell*, 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461 (1917). But this case dealt only with individual contracts between an employer and its employees, and treated these contracts principally, if not wholly, from the standpoint of the ancient law relating to the enticing away of servants. The constitutional questions raised by the defendants here were not alluded to. When the full scope of that court's construction of the free-speech guaranty of the federal constitution was considered in a case involving a contract between an employer and an individual employee, a conclusion directly opposite to that in the *Hitchman Coal Company* case, *supra*, was reached. *American Federation of Labor* v. *Swing*, 312 U. S. 321, 61 S. Ct. 568, 85 L. Ed. 855 (1941). In this case, the Supreme Court of Illinois had affirmed the action of the Illinois Appellate Court in reversing an order of the Circuit Court of Cook County, dismissing a suit for an injunction against picketing in an attempt to unionize a non-union shop. The Supreme Court of the United States held that the injunction against such picketing violated the free speech guaranteed by the Federal Constitution. And in a case which involved a contract with an organized labor group, the court has directly refused to follow the *Hitchman* case. *Journeymen Tailors Union, etc.* v. *Miller's, Inc.*, 312 U. S. 658, 61 S. Ct. 732, 85 L. Ed. 1106. In this case, the Court of Errors and Appeals of New Jersey had allowed an injunction against the picketing by one union of a place of business which employed a tailor belonging to a competing union. The Supreme Court of the United States, upon petition for certiorari, disposed of the case as follows: "Per Curiam, The petition for writ of certiorari is granted and the judgment is reversed." We thus find that the Supreme Court of the United States, in its latest pronouncements, has refused to permit injunctions against picketing which may tend, or is intended, to bring about the breach of labor contracts, whether with individual employees, or with a

labor union, basing its decisions upon the proposition that such injunctions violate the picketers' right to free speech and free press guaranteed by the Federal Constitution. It is not for us to discourse on the soundness or propriety of these holdings. It is ours only to recognize their binding effect on us; and, accordingly, following these decisions, we must hold that the plaintiff was not entitled to an injunction on the ground that the picketing would tend to bring about a breach of its contract with the Brotherhood of Dairy Salesmen, Inc.

There remains to support the injunction only the theory that in parading the placards bearing the legend "Blossom Dairy Unfair to Organized Labor" the picketers were disseminating false and libelous statements to the plaintiff's injury. And it is true that the defendants have failed to establish by proof the specifications of unfairness set out in their answer, namely, that the Brotherhood of Dairy Salesmen, Inc., was company organized, supported or controlled, or that the Brotherhood of Dairy Salesmen, Inc., was a "bogus" or "phony" union.

The proclaiming of falsehoods, while peaceably picketing an employer's place of business is not protected by the constitutional guaranty of free speech. In the case of *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 57 S. Ct. 857, 81 L. Ed. 1229, Justice Brandeis in justifying peaceful picketing, observed that "the publicity did not involve misrepresentation of fact, nor was any claim made below that relevant facts were suppressed." In *Thornhill v. State of Alabama,* 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093, the opinion ventures no further than that "The freedom of speech and of the press, guaranteed by the constitution, embraces at least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint of fear of subsequent punishment." The opinion in *Carlson v. State of California,* 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1093, includes this observation regarding a county ordinance regulating picketing which was held repugnant to the right of free speech: "It contains no exceptions with respect to the truthfulness and restraint of the information conveyed * * *." And one basis

of the court's finding in *Bakery & Pastry Drivers, etc.* v. *Wohl*, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178, that the picketing was lawful was, that "The trial court found that the placards were truthful and accurate in all respects." No case has been found in which any court, state or federal, has held that the communication or dissemination of falsehoods or of malicious statements by speech, press or otherwise is protected by any constitutional guaranty. But so long as the pickets are peaceful and disseminate the "truth" or the "facts" in which they have a legitimate interest they may not be disturbed. Is, then, the use of the words "unfair to organized labor", as displayed by the pickets in this case the spreading of a falsehood, so as to become the basis of an injunction?

Courts have come very generally to recognize that the word "unfair", as commonly used by labor unions, does not bear its primary and usual meaning, but has a well-known and well-understood peculiar and specific significance. This unique meaning of the word when so used is not capable of precise judicial determination, except negatively. It appears to be merely a word of disapprobation, or invective, loosely applied to any person or practice, which fails to meet the approval, for the time being, of the protesting labor organization. At most, they are ordinarily a mere expression of opinion, or of a conclusion. Some courts take a different view and enjoin the use of the word "unfair" unless the user can justify its application in the ordinary sense. *Traub Amusement Co.* v. *Macker*, 127 Misc. 335, 215 N. Y. S. 397; *Driggs Dairy Farms, Inc.* v. *Milk Drivers, etc., Union*, 49 Ohio App. 303, 197 N. E. 250; *Hotel, etc., Local Union* v. *Miller*, 272 Ky. 466, 114 S. W. 2d 501. But the great weight of authority is to the effect that the word "unfair" as used in the parlance of organized labor is not actionable either at law or in equity. "By far the preponderance of judicial decisions, however, supports the rule that labor unions have the right to banner an employer as unfair in connection with a labor controversy." Ludwig Teller on Labor Disputes and Collective Bargaining, Vol. I, page 391. This statement is abundantly supported in case law. Illustrative cases are: *Senn* v. *Tile*

*Layers Protective Union, supra* (1937); *Denver Local Union* v. *Perry Truck Lines, Inc.,* 106 Colo. 25, 101 P. 2d 436 (1940); *Schuster* v. *International Ass'n., etc.,* 293 Ill. App. 177, 12 N. E. 2d 50 (1938); *Vonderschmitt* v. *McGuire,* 100 Ind. App. 632, 195 N. E: 585 (1935); *Johnson* v. *Milk Drivers, etc., Union,* La. App., 195 So. 791 (1940); *Iverson* v. *Dilno,* 44 Mont. 270, 119 P. 7î9 (1911); *Steffes* v. *Motion Picture, etc. Union,* 136 Minn. 200, 161 N. W. 524 (1917); *Thompson Co.* v. *Delicatessen Union,* 126 N. J. Eq. 119, 8 A. 2d 130 (1939); *Manker* v. *Bakers' Union,* 129 Misc. 516, 221 N. Y. S. 106 (1927); *S. A. Clark Lunch Co.* v. *Cleveland Waiters Local,* 22 Ohio App. 265, 154 N. E. 362; *Kimbel* v. *Lumber Union,* 189 Wash. 416, 65 P. 2d 1066 (1937); *My Maryland Lodge* v. *Adt,* 100 Md. 238, 59 A. 721 (1905); *State* v. *Van Pelt,* 136 N. C. 633, 49 S. E. 177, 68 L. R. A. 760, 1 Ann. Cas. 495; *J. F. Parkinson Co.* v. *Building Trades Council, etc.,* 154 Cal. 581, 98 P. 1027,.21 L. R. A. (N. S.) 550, 16 Ann. Cas. 1165 (1908); *J. B. Watters & Son* v. *Retail Clerks' Union,* 120 Ga. 424, 47 S. E. 911 (1904); *Labor Review Publishing Co.* v. *Galliher,* 153 Ala. 364, 45 So. 188, 15 Ann. Cas. 674 (1907).

We are thus led to the conclusion that all things charged and proven against the defendants in the case at bar were permissible under the free-speech guaranty of the Federal Constitution, and hence cannot be the basis of the injunction awarded by the lower court. Accordingly, the order appealed from is reversed, and the bill dismissed.

*Reversed and dismissed.*

Fox, President, dissenting:

I would affirm the decree of the Circuit Court of Kanawha County, to the extent that it enjoins the defendants from picketing the stores and places of business of the plaintiff, on the ground that the banners used in said picketing contained a false statement of the attitude of the plaintiff with respect to organized labor, and on that ground alone. I dissent from the majority opinion which, in effect, holds that the charge that the plaintiff was unfair to organized labor, even though untrue, did not justify

the awarding of the permanent injunction in this cause. I feel that the principle followed in the majority opinion, if carried to its logical conclusion, will result in every employer being subjected to the threat of "picketing", if not the practice, in utter disregard of his agreements and contracts with labor unions. Further, it opens the door to practices which are calculated to result in lasting hurt to organized labor, although, in fairness to the defendants, it should be said that in the case at bar there is nothing on which even a suspicion of such practices can be based.

In my opinion the real test of whether or not an employer is unfair to organized labor rests in his attitude toward collective bargaining, coupled, of course, with his practices with respect thereto. The principle of collective bargaining is so well established, both by federal statutes and by the decisions of the courts, state and federal, as to require no discussion. I would say that an employer who refuses to bargain collectively with his employees may truthfully be charged with being unfair to labor; but it does not follow that his failure to bargain with any particular labor union lays him open to the charge of being unfair to organized labor in general. At the present time, there are three, perhaps more, *competitive* unions of organized labor, national in their scope, and a great many more independent local organizations, in addition to the so-called company unions. These independent unions are treated by the Supreme Court of the United States, and by the federal statutes, as being labor organizations, with which an employer may contract, provided they are entirely free from his influence, exerted either in the organization thereof, or subsequent thereto. They are recognized by law, and entitled to the same recognition by employers as if they were associated with some national labor movement, and employers should be permitted to bargain and contract with them to the same extent as if they were so associated, and I think the employer who bargains with such independent union, contracts with it, and keeps his contract, cannot truthfully be charged as unfair to organized labor in general. The answer of the defendants, on the presentation of this matter to the cir-

cuit judge, included in the contention that the union with which the plaintiff company contracted was controlled by the employer. It is now practically conceded that even if the burden were placed upon the employer to show that the union with which he had bargained and contracted was not so controlled, he being the one to whom that proof is most available, that burden has been successfully carried by the complainant here.

The basic principle of collective bargaining does not relieve labor of all semblance of competition, but every organization representing an available membership sufficient to operate the unit involved, has the status to bargain collectively. The employer may bargain with more than one organization exercising the same jurisdiction, but all but one must be excluded when the contract is entered into, and all but the one with whom the contract is made may consider that the employer has treated them unfairly. No one questions their right, as an organization, or as individuals, to reach that conclusion, nor is their right questioned to voice that conclusion in any manner they wish so long as they adhere to the truth. The courts are agreed that a harmful "false" statement by placard, or otherwise, may be enjoined, and under the law of slander and libel, it may be punished by recovery of punitive damages.

I believe, therefore, that the basic question in this case, which, fortunately, involves peaceful picketing, and a prompt and full compliance with the injunction order, appealed from, is whether or not the placard's statement "Blossom Dairy Company Unfair to Organized Labor" is to be regarded as true, or otherwise. The majority opinion takes the position that because the word "unfair" in the usage of the different labor units, is used as applying to any and all labor controversies, that it should be so accepted in the case at bar, and cite a number of cases, which, in varying degrees, sustain that viewpoint. In that event, the statement of the placard is true only because Teamsters Union No. 175 was refused a contract which it wanted. Is that unfair? Of course, if the expression were addressed and confined to a class of persons who would accept it as meaning only a controversy with one union, it might be

taken as correct, meaning only that the employer was engaged in a controversy with some branch of organized labor, in spite of the fact that he was then operating under a fair and binding contract with a different branch of organized labor covering exactly the same employment. That view, however, would render every employer in the State of West Virginia subject to picketing, because he could not agree with both sides in a jurisdictional or inter-labor controversy. On the other hand, if the placards are looked at as addressed, not to organized labor exclusively, but to the public at large, it seems to me quite clear that the words "unfair to organized labor", in common accep-tation, means the refusal to recognize the only basic prin-ciple for which all organized labor, including the largest units, and not excepting the smallest unit, is known by all to stand united, that is to say, the theory of collective bargaining. No employer can recognize every designation borne by labor organizations, for there is strife and com-petition within them, the harmful consequences of which, fair employers, willing to recognize collective bargaining as a basic principle, should not be obligated to suffer. There can be no question but that the plaintiff had fully recog-nized, in so far as the showing of this record is concerned, the principle of unhampered collective bargaining. It had a contract, shown to be satisfactory to an independent union, with which it had no direct or indirect interest or influence. That character of union is generally recognized as being a part of organized labor, and, therefore, in my judgment, the particular statement upon the placard be-fore us here is not borne out by the facts. A plausible argument could be made in support of the proposition that if the placard had been limited to unfairness to Teamsters Union 175, or limited to the statement of unfairness to the general opinion of that union, so that people intended to be affected by it would not have accepted it as meaning the rejection of the principle of collective bargaining, the practice could be successfully defended. But even in that case, it occurs to me that if terms are to be considered as used in their common acceptation, and if, under the law, civil liability rested upon the false use of the term in

that sense, a dissatisfied local labor union should not be accorded the special privilege of using language known and intended to mislead the public at large to the damage of another, because the term might be susceptible of a technical definition different from its general acceptation by the public.

The majority opinion attempts to minimize the effect of the use of the term "Unfair to Organized Labor". It is said, in effect, that it means little, or nothing. It seems to be forgotten that this term is almost universally used in picketing, and that its purpose is to injuriously publicize an employer's attitude toward labor, so as to cause regular and prospective customers to refuse to patronize the business picketed, and thereby operates to coerce an employer to yield to the demands of those who direct the picketing. Picketing means this if it means anything. I believe in treating things as they are—in dealing with realities. I see no reason why we should consume words and space in trying to attach technical meanings to terms employed, or to engage in a play upon words. We know the practical effect and purpose of picketing and of the use of the charge that an employer is unfair to labor, and we know its effect on the business towards which the charge is directed. All the explanations which learned lawyers and judges can make touching the use of the term do not erase the fact that the purpose of its use is to force compliance by an employer with some demand made upon him by those who engage in picketing. The numerous cases, pro and con, cited in the majority opinion on this point, emphasize the fact that courts, instead of dealing with realities, sought in this manner to justify a course of action which, for some reason, they were anxious to take. I am of the opinion that the day will come when disputes between employer and employee will be settled on the basis of absolute fairness to each, and that false statements and unfair practices on the part of either will, in a large measure, disappear, and certainly will have no legitimate place in the settling of controversies. I think a good time to begin is now. I think this Court should say that, so far as we are permitted to judge, employers and employees

alike should be protected against false statements which are calculated to prejudice their interests.

In connection with what has been said, it should be here stated that there can be no legitimate and real collective bargaining where the parties thereto are not entirely free to act in their respective interests. Therefore, there can be no true collective bargaining between an employer and his employees where the union bargained with is one which has been established, encouraged, supported or in anywise subject to the influence of the employer. To state the matter concretely, if the plaintiff herein encouraged or influenced the formation of the Brotherhood of Dairy Salesmen, Inc., a contract with that organization would be unfair to labor in general, and peaceful picketing of its places of business would be justified under the law. However, such a situation does not here exist. The majority opinion, affirming the opinion of the trial court on that point, holds that the Brotherhood of Dairy Salesmen, Inc., was a legitimate independent union, free from the influence of the plaintiff, and one protected and recognized as such, and one with which the plaintiff had the right to deal. The Court is unanimous in this holding, and it is unnecessary for me to comment on the reasons therefor.

The majority opinion admits that the defendants have failed to establish by proof the charge of unfairness set out in their answer, namely, that the independent union with which the plaintiff contracted was a "bogus" or "phony" union. It also admits that giving publicity to a falsehood, while peacefully picketing an employer's place of business is not protected by the constitutional guarantee of free speech, and then cites many cases sustaining this proposition. In spite of these admissions, which, in my judgment, should be determinative of this case, the opinion then goes on to ignore the logical application of these admissions, and because of some doubt as to the real technical meaning of the term "unfair to labor", sustains the right of the defendants to give publicity to a charge found by the court to be untrue. I am unable to follow this line of reasoning. How can it truthfully be said that the plaintiff, in contracting with this independent union was unfair to

labor? How can we justify the parading of banners in front of its places of business which publish the charge that it is unfair to labor, and thereby endanger its business future? Is not an employer who has bargained and contracted with a legitimate labor union entitled to some protection? Must he be sacrificed to existing strife between different labor organizations? Has he no rights which the law will protect?

I realize the force of the position of the defendants that independent unions serve to weaken the prestige and influence of nationally organized labor. I can well understand the reasons for the policy of the nationally organized unions in seeking to bring within their folds all of the workers of the country. I am fully aware of the fact that if all of the workers were organized into one great national union, the power and influence of that organization would be greater than it now is where labor is organized in different groups. But I do not think anyone possesses the right or power to force membership in any given union upon any individual. To do so would take away individual liberties, and I think individual liberty is still of some consequence. Conceding that the power and prestige of labor would be served by greater unity among the workers, I am still unable to bring myself to the view that men cannot join the union of their choice, or that employers cannot contract with any union which their workers may select as their bargaining agent, without being charged with being unfair to organized labor.

The case before us is simple. The plaintiff dealt with a legitimate labor union. For so doing, the defendants charged it with being unfair to labor. That charge, under the law, and as the trial court and this Court have found, was untrue. In finding that it was untrue, I do not mean to say that it was wilfully publicized with knowledge of its untruth, because the defendants, no doubt, believed the charge to be true. That, however, does not excuse the circulation of a charge that was in fact untrue, and, therefore, the plaintiff is entitled to the protection which, in theory at least, the law throws around those who engage in lawful pursuits.

There are two other matters of lesser importance which it seems to me require some comment. First, it is said that the picketing enjoined only lasted one hour, that it was peaceful, and that no damage is shown to have been done plaintiff's business. Granting that this is true, it must not be forgotten that if the picketing had not been enjoined, it may be assumed that it would have continued, and that plaintiff's business would have been injuriously affected thereby. That was the manifest purpose, else why the picketing? It was pressure exerted by picketing, in the belief that plaintiff's business would be injuriously affected thereby, to the extent that it would be forced to comply with defendants' demands. It seems unnecessary to say that injunction is a preventative remedy, and ordinarily, it is sought to prevent the commission of wrongful or damaging acts, rather than to await the consummation of such acts. Second, it is also said that one of plaintiff's managers stated, in effect, that it was immaterial to him and his company what labor union his employees joined, and it is argued that this being true, why this suit? The answer is, the plaintiff had an existing contract with the labor union which a part of its employees had formed. It was bound by the terms thereof, could not lawfully repudiate it, and it was, therefore, wholly within its rights in seeking to avoid injury to its business, while living up to its contract which it lawfully made. No doubt, the plaintiff was unconcerned as to the union to which its employees belonged, and frankly said so. It could say nothing else without being charged with trying to dictate to its employees a thing which it is not permitted to do. The outcry which would have arisen had the plaintiff, through one of its managers, expressed a preference as to the union which it desired its employees to join, can easily be imagined.

There seems to be no evidence in the cause as to the publication of statements through newspapers and otherwise, and I do not wish to argue the question of whether or not the decree of the trial court should be affirmed on the theory that the defendants should be enjoined from attempting to enforce a violation of a lawful contract

then in existence. I do not approve, in principle, the theory that any person, under the guise of the exercise of free speech, should be permitted by coercion through picketing to compel the repudiation of such a contract; but the majority may be correct in its position, that we are bound by the rulings of the Supreme Court of the United States on that question.

I would, therefore, affirm the decree of the Circuit Court of Kanawha County on the one point mentioned at the beginning of this dissent.

KENNA, JUDGE, dissenting:

Like Judge Fox, I believe that injunction proceedings of this nature should not be permitted to rest for decision upon finely spun distinctions in the use of words, but that since picketing is a practice the result of which is dependent upon public opinion and the effect it has upon the public at large, the question involved should be approached upon that same plane and not from a different level; that is to say, the legal effect of a public declaration should be gauged by the meaning attached to it by the public at large: not by a different meaning given it by the publisher and, perhaps, by a small part of his hearers. That is especially the case when its ordinary meaning is far more damaging than its restricted meaning, as here. The publisher's good faith might be relied upon in mitigation. We are not concerned with that now.

I do not concede that the cases cited in the majority opinion all support its treatment of the meaning of the word "unfair", and will illustrate my doubt a little later, but supposing, for the time, that the clear weight of authority would justify the use of the single word "unfair" under the circumstances shown by this record, that is by no means the situation we have to deal with here. Placards carried by the pickets at the places of business of Blossom Dairy Company went much further and stated that it was "unfair to organized labor". At that moment Blossom Dairy was operating under a contract eminently satisfactory to its employees entered into as the result

of collective bargaining with a labor union, here unsuccessfully attacked by respondents as "phony", the fairness of which is not so much as questioned. Assuming for the moment, that the meaning of the word "unfair" is restricted in the manner adopted in the majority opinion, certainly the term "unfair to organized labor" is much more definite and applies to all legitimate labor organizations formed to procure and maintain satisfactory working conditions. Emphasizing the fact that I am speaking of what appears from this record, Blossom Dairy, in so far as its treatment of organized labor and its principles is concerned, must be viewed as having accorded to it every proper recognition and consideration. From a legal viewpoint, it must be recognized that Blossom Dairy had entered into an effective and existing contract with a unit of organized labor which was satisfied to operate its plants when they were picketed by Teamsters Union No. 175. Therefore, although it might truthfully be said that it was "unfair" to Teamsters Union 175, according to its use of the term, or, perhaps, to some other unit of organized labor, or indeed to the American Federation of Labor at large, it could not be said truthfully that it was unfair to organized labor without exception or as a whole. I believe that statement, even under the reasoning in the majority opinion, should be regarded as untrue. When the statement of unfairness comprehends all organized labor, to my mind, its untruthfulness is plainly established by proof of a fair operating contract with organized labor. See annotation 116 A. L. R. 484, at 498. See also, prior annotations cited at page 497. Since it is generally conceded that the constitutional guarantee of free speech does not permit the use of placards displaying damaging false statements in picketing a place of business, I believe that upon the theory followed in the majority opinion the order of injunction entered by the Circuit Court of Kanawha County should have been modified and continued until the expiration of the contract in November, 1942, which was the order of the circuit court.

In addition I feel quite strongly that the use of the word "unfair" should not be permitted in addressing the

public at large when its use is justified only by a "unique meaning" founded on "a well-known and well-understood, peculiar and special significance", to quote the majority opinion. I believe that an examination of the cases used by the majority will throw considerable doubt upon their sustaining the text quotation from Ludwig Teller on "Labor Disputes and Collective Bargaining." For example, the second syllabus point of *Steffes* v. *Motion Picture, etc., Union,* 136 Minn. 200, 161 N. W. 524, speaking of organized labor generically or as a whole, reads as follows: "The term 'unfair' as used by organized labor means that the person so designated is unfriendly to organized labor, or refuses to recognize its rules and regulations." Certainly, this does not sustain the text statement that labor unions, presumably locals, have the right to banner employees as unfair in connection with (all?) labor controversies. Cases have been known in which the position of a local was not supported by its own national union. In a later Minnesota case the Supreme Court of that state declined to dissolve an injunction that forbade the untrue use of the word "unfair" as a part of the phrase "Unfair to organized labor", the decision, however, turning upon the construction of a Minnesota statute. *Campbell* v. *Motion Picture M. O.,* 151 Minn. 220, 186 N. W. 781, 27 A. L. R. 631. The case of *Labor Review Publishing Co.* v. *Galliher,* 153 Ala. 364, 45 So. 188, 15 Ann. Cas. 674, is a libel case which goes far afield from sustaining the use of the word "unfair" in any unique sense, but, to the exact contrary, the second point of syllabus reads as follows: "In construing libelous publications the whole must be considered, and that construction must be given which will accord to the words used their plain and popular sense—that meaning which is most natural and obvious, and in which the public understands them."

In the light of the foregoing, it is my opinion that the term "unfair to organized labor" upon a picketing placard should be given its ordinary and usual meaning, that is, opposed to collective bargaining, and that in that sense applying it to an employer who has a subsisting collective contract with organized labor, the fairness of which is

not attacked, constitutes an untrue statement, the damaging use of which may be properly enjoined, and that the same result follows if the word "unfair" is given its restricted meaning in the lexicon of organized labor, because an employer living up to the terms of such a contract cannot be. unfair to all organized labor as the placard states.

Peaceful picketing accompanied by the use of truthful comment is not here involved.

I would affirm the decree as modified to conform to this memorandum.