Lyle **KIRKER**, Secretary-Treasurer and Business Manager of the Laborers' District Council of Charleston, West Virginia, Laborers' District Council of Charleston, West Virginia, and Vernon R. Gollihugh et al., Plaintiffs,

v.

Arch A. **MOORE**, Jr., individually and in his capacity as Governor of the State of West Virginia, William S. Ritchie, individually and in his capacity as State Road Commissioner of the State of West Virginia, Ted R. Riffle, individually and in his capacity as Cabell County Supervisor of the State Road Commission of West Virginia, and State Road Commission of West Virginia, Defendants.

Civ. A. No. 69–61.

United States District Court
S. D. West Virginia,
Charleston Division.

Jan. 12, 1970.

Jules Bernstein, Washington, D. C., and James B. McIntyre, Charleston, W. Va., for plaintiffs.

F. Paul Chambers, John R. Lukens and Louis Southworth II, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for defendants Governor Arch A. Moore, Jr., William S. Ritchie, State Road Commission and Ted R. Riffle in his official capacity as county road supervisor.

Richard E. Tyson, Huntington, W. Va., for Ted R. Riffle individually.

## MEMORANDUM OPINION

FIELD, Chief Judge.

This action was instituted by Lyle Kirker in his capacity as Secretary-Treasurer and Business Manager of the Laborers' District Council of Charleston, West Virginia (hereinafter referred to as "Council") which is a labor organization and a voluntary unincorporated association affiliated with the Laborers' International Union of North America,

AFL-CIO, the Council itself, and 20 individual citizens of West Virginia, which individual plaintiffs allege that they bring this action on behalf of themselves and "all of the approximately 3300 employees of the West Virginia State Road Commission who are similarly situated." The defendants are Arch A. Moore, Jr., Governor of West Virginia, William S. Ritchie, State Road Commissioner of West Virginia, and Ted R. Riffle, Cabell County Supervisor of the State Road Commission of West Virginia, each in their capacity as public officers and as individuals. Additionally, the State Road Commission of West Virginia is named as a defendant herein.

The complaint alleges that this action arises under the Civil Rights Act of 1871, 42 U.S.C. Section 1983, to redress the deprivation by the defendants, acting under color of the laws of the State of West Virginia, of the rights, privileges and immunities secured and guaranteed to the plaintiffs by the first, fifth and 14th amendments to the Constitution of the United States as well as under the constitution and laws of the State of West Virginia. Jurisdiction is based on 28 U.S.C. Sections 1331 and 1343.

The complaint states that prior to March 11, 1969, the employee-plaintiffs were employed by the State Road Commission of West Virginia and that on that date the defendant, Arch A. Moore, Jr., acting under color of the laws of the State of West Virginia discharged employee-plaintiffs. The complaint alleges that this action by defendant Moore was in violation of the designated amendments to the Federal Constitution and the constitution and laws of the State of West Virginia in the following respects:

(1) Defendant Moore lacked authority under the constitution and laws of the State of West Virginia to discharge the employee-plaintiffs.

(2) The discharge of the employee-plaintiffs was the result of their union affiliation and activity and as such contravened their rights to petition for redress of grievances and to engage in free speech and association guaranteed to them under the constitutions of the United States and the State of West Virginia.

(3) The discharge of employee-plaintiffs was for the purpose of effectuating the "spoils system" of political patronage in West Virginia, which system violates the designated amendments to the Federal Constitution as well as certain provisions of the constitution of the State of West Virginia.

(4) The refusal of the defendant Ritchie, as State Road Commissioner, to meet and confer with the representatives of the employee-plaintiffs relative to the redress of grievances arising out of their employment violated their rights under the designated amendments to the Federal Constitution as well as certain provisions of the constitution of the State of West Virginia.

(5) Plaintiffs were discharged from their employment without proper notice, written specific charges, opportunity for a hearing, right of confrontation and defense and other incidents of due process of law to which they are entitled under the designated amendments to the Federal Constitution and provisions of the constitution of the State of West Virginia.

The complaint seeks relief as follows:

(1) An order setting aside and nullifying the discharge of the employee-plaintiffs from their employment;

(2) Judgment against the defendant Moore and the Commissioner, jointly and severally, in favor of the employee-plaintiffs to reimburse them for their loss of income resulting from their discharge from March 11, 1969, to the date of judgment;

(3) A mandatory injunction requiring defendant Ritchie to meet and confer with plaintiff Kirker, as representative of the employee-plaintiffs, for the purpose of discussing redress of the grievances of the employee-plaintiffs;

(4) An injunction prohibiting the defendants Ritchie and Riffle, together with any other agent or employee of the

Commission, from discriminating among employees or applicants for employment of the Commission on the basis of political or union affiliation or activity;

(5) An award of exemplary damages from the defendants, jointly and severally, in the amount of $250,000, together with reasonable attorneys' fees and costs.

Each of the defendants, Moore, Ritchie and Riffle, in their official capacities and as individuals, have filed motions to dismiss this action, and by leave of the Court the defendants, Moore and Ritchie, were also permitted to file their answer to the complaint prior to the Court's disposition of the dismissal motions. The plaintiffs filed a motion for a determination that the action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and also filed a motion for a preliminary injunction. All of these motions were brought on for hearing and argument on August 19, 1969, and at the conclusion thereof the Court advised counsel that the plaintiffs' motion for a temporary injunction would be denied and that the disposition of the remaining motions would be taken under consideration. In response to the joint request of counsel for the parties, the Court directed a letter to them under date of September 13, 1969, setting forth specific findings of fact and conclusions of law relative to the motion for the temporary injunction pursuant to Rule 52(a) F.R.Civ.P. In addition to the pleadings filed by the respective parties, the affidavit of the plaintiff Lyle Kirker, and the affidavit of Oliver W. Singleton, Regional Director for Region VI, AFL-CIO, were filed on behalf of the plaintiffs and the affidavits of Arch A. Moore, Jr., and William S. Ritchie were filed on behalf of the defendants. In addition thereto at the hearing on the several motions counsel for the plaintiffs were permitted to file the affidavit of Cecil H. Underwood and counsel for defendants were permitted to file a memorandum dated July 7, 1969, directed to "THE STRIKING STATE ROAD COMMISSION EMPLOYEES" by the plaintiff Kirker.

Counsel have also submitted briefs in support of their respective positions on these motions, the final brief having been received on September 22, 1969. To a large degree the facts incident to the disposition of these motions are undisputed, and my rulings thereon will be made based upon the pleadings, affidavits and exhibits to which reference has been made.

Briefly stated, the facts are as follows: The defendant Moore, the nominee of the Republican party, was elected Governor of West Virginia on November 5, 1968, and qualified and began his term of office on January 13, 1969. At the time of Moore's inauguration as Governor, the Legislature of West Virginia had already convened for its constitutional biennial 60-day session and continued in session until midnight on March 8, 1969. The defendant Ritchie was appointed Road Commissioner by Governor Moore effective February 1, 1969, which appointment was subject to confirmation by the Senate of West Virginia and was at the will and pleasure of the Governor.

Prior to the 1968 election, the plaintiff Kirker, as representative of the plaintiff Council, had been engaged in an organizing campaign to encourage employees of the Road Commission to designate the Council as their representative for the purpose of dealing with the Commission relative to conditions of employment, establishment of seniority rights, protections against wrongful discharge, grievance procedures and other matters customarily falling within the area of the collective bargaining process. In the organizing campaign the Council sought to obtain authorization cards from the employees of the Commission designating the Council as their representative. The authorization card contained the following language:

"I hereby designate the Laborers District Council of Charleston, W. Va. to represent me for the purpose of collective bargaining and in any and all other situations that may arise under the operation of the National Labor

Relations Act and/or with any individual employer where the provisions of the National Labor Relations Act are not invoked."

Between August 24, 1968, and March 1, 1969, approximately 4,000 employees of the Commission signed such authorization cards.

Shortly after his appointment as Road Commissioner, Ritchie received a call from Don Smith, a representative of the Laborers' International Union of North America, AFL-CIO, who requested an appointment for himself and Kirker. Pursuant thereto, Ritchie met with Smith and Kirker on February 6, 1969, and at that time Kirker advised Ritchie that the Council represented a substantial majority of the Commission employees and desired to discuss with the Commission the terms and conditions of employment of the employees which it represented. Ritchie was of the opinion that Kirker desired to obtain a collective bargaining agreement between the Commission and the Council concerning the terms and conditions of employment of the employees of the Commission, and advised Kirker that since he, Ritchie, had only recently undertaken his duties as Commissioner, he desired additional time to consider the matter and discuss it with Governor Moore.

Thereafter on February 10, 1969, Kirker wrote Ritchie advising him that since the meeting on February 6, he had been besieged by calls from State Road employees to the effect that large scale replacements were to take place on Monday, February 17. In his letter Kirker acknowledged that on October 30, 1968, Moore had indicated that he did not anticipate discharging jobholders merely for political expediency, but that despite such statements the fear of discharge persisted among the Commission employees. Following receipt of this letter, Ritchie in a conversation with Kirker advised him that he did not intend to make any large scale replacement of Commission employees and that the "fears" to which Kirker referred in his letter were, in fact, unfounded. Ritchie continued to advise Kirker that he had brought the subject to the attention of Governor Moore and that it was under continued study.

On February 24, 1969, Kirker advised Ritchie that the employees of the Commission were becoming increasingly concerned about their job security as well as other grievances and that a walkout might be imminent. Ritchie stated that the question was being considered by him and Governor Moore, but when Kirker heard nothing further from Ritchie, as stated in Kirker's affidavit, " * *. * on March 3, 1969, in the face of the failure of the Commission to recognize the Council as their representative, many of the employees of the Commission engaged in a refusal to work and went on strike." Thereafter on March 5, 1969, Kirker asked Ritchie to meet and discuss the situation, but later that day was advised by Ritchie that no meeting would be held.

On March 6, 1969, hazardous road conditions were developing in sections of the State as the result of snow and ice on the highways and by that evening vehicular travel was extremely dangerous. Ritchie, as Road Commissioner, issued a statement through the various communication media in which he stated his concern about the condition of the highways and asked all Road Commission emergency snow crews to report to work immediately in their various counties and proceed with the work of clearing the highways for the safety and protection of the travelling public. This request had gone to the District headquarters and to the County headquarters of the Road Commission. Employees in several Counties responded to the appeal but maintenance operations remained halted in the great majority of the Counties.

On the morning of March 10, 1969, fresh snow fell over much of the State and due to low temperatures on the evening of that day and the early morning of March 11, many of the highways were covered by ice. Further snow on March 11 compounded the hazardous highway conditions.

The Road Commission had made another appeal to the Road Commission employees asking that they report for work to clear the highways and relieve the emergency conditions, but received no substantial response thereto, and on the morning of March 11, 1969, Ritchie advised Governor Moore that he had concluded that the employees who were actively participating in the strike should be replaced so that action could be taken to clear the highways. Governor Moore concurred in the recommendation and at noon on March 11, held a press conference at which he made a statement with respect to the situation. The statement in its entirety is appended as an exhibit to the answer of the defendants, and reads in part as follows:

"* * * continuing snow in the State of West Virginia has added to the perilous conditions of the roads of the state, and the situation has now reached a critical point. As your Governor, it is up to me to act to protect the health and safety, and the welfare of the citizens of this state and to do everything I can to see that the citizens and the economy of the state do not suffer further family losses or economic setbacks. For these reasons, and in support of my Road Commissioner with whom I have been in constant touch since the unprecedented action of the Road Commission employees, and who has labored long and hard in an effort to meet these problems, I am ordering the immediate discharge of all Road Commission employees who are off their jobs at this moment. This action is taken with the firm and widespread belief that a strike by employees of State Government is illegal in the first instance, but more importantly, the situation can no longer be tolerated. * * * Our highways must be cleared of snow and ice and made safe for the traveling public. * * * it is my responsibility to see that every essential state service is made available to all of the citizens of this entire state. * * * Now we're presently confronted with additional forecasts of snow on top of the already hazardous conditions. And this, in my judgment, makes it necessary for me to see that immediate work be undertaken on all the highways of the state."

Attached as an exhibit to the affidavit of the plaintiff Kirker is a list of the names of the persons from whom the Council obtained cards of authorization to be their collective bargaining representative. The exhibit contains the names of 3,843 individuals and an analysis of the names on the list made by the staff of the Road Commissioner on or about May 1, 1969, reflects as follows:

(1) 19 of the individuals were dismissed prior to March 3, 1969.

(2) 28 of the individuals have retired.

(3) 12 of the individuals are deceased.

(4) 319 of the individuals have voluntarily resigned their employment.

(5) 11 of the individuals are not employees of the Road Commission.

(6) 50 of the individuals were dismissed incident to the strike, were subsequently rehired, and have since voluntarily resigned their employment.

(7) 119 of the names could not be found in the Commission records.

(8) 1,532 of the individuals were still employed by the Commission which number includes employees who were discharged on March 11 but thereafter rehired.

(9) 1,752 of the individuals who were discharged on March 11 have not been re-employed by the Commission.

This analysis by the Road Commission staff does not appear to be controverted by counsel for the plaintiffs.

In their several motions the defendants asked the Court to dismiss this action upon the grounds that the complaint fails to state a claim upon which relief can be granted and that this Court lacks jurisdiction of the subject matter. The reasons assigned in support of the motions are: (1) the employee-plaintiffs were discharged from their employment with

the Road Commission for their willful refusal to perform services on the highways of the State at a time when such services were necessary for the health, safety and welfare of the citizens of the State; (2) the complaint fails to delineate any rights of the plaintiffs allegedly violated by the defendants which are secured and guaranteed to the plaintiffs by the laws or Constitution of the United States; (3) the defendants are immune from this suit; (4) there is no diversity of citizenship between the parties litigant nor claims arising under the Constitution or laws of the United States which would support jurisdiction in this Court; and (5) the alleged grounds of federal jurisdiction are frivolous and unsubstantial and accordingly would not support jurisdiction in this Court under the theory of pendent jurisdiction.

The plaintiffs have advanced a multiplicity of arguments in opposition to the dismissal motions. However, it is clear that the primary and, indeed, the dispositive issue is whether the plaintiffs had a right to engage in a strike against the State of West Virginia under either federal or state law.

While several federal appellate courts have recently indicated that the right of public employees to belong to a labor union falls within the constitutional protection of the first and 14th amendments, none of them sanctions nor suggests that the right to strike or even the right to obtain a collective bargaining agreement from the sovereign falls within the ambit of federal constitutional protection. See Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.N.C.1969). This traditional prohibition against the assertion of the right to strike against the federal government was articulated by Chief Justice Warren in Amell v. United States, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445, when he observed (at 161, 86 S.Ct. at 1386):

"By virtue of their governmental employment, the petitioners' right to join unions and to select bargaining representatives, unlike that of private sea-men, exists only by express leave of the President, Exec. Order No. 10988, 27 Fed.Reg. 551 (1962), and they are forbidden, under pain of discharge, fine and imprisonment, from exercising or asserting the right to strike, * * *."

The Congress of the United States recognized this principle when it specifically excluded employees of the federal government, states and political subdivisions from the legislation which gave employees the right to organize, bargain collectively and engage in strikes and other concerted union activities. Labor-Management Relations Act, 29 U.S.C.A. § 152(2) and (3). The distinction between employment in the private sector of the economy and employment by the government was also judicially noted in United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Court stating (at 289, 67 S.Ct. at 694):

"We hold that in a case such as this, where the Government has seized actual possession of the mines, or other facilities, and is operating them, and the relationship between the Government and the workers is that of employer and employee, the Norris-LaGuardia Act does not apply."

In Atkins v. City of Charlotte, supra, the Court recognized the constitutional right of public employees to join a labor union, but specifically declined to countenance their right to strike. Judge Craven, speaking for the Court, stated (296 F.Supp. at 1076):

"The thought of fires raging out of control in Charlotte while firemen, out on strike, Neroicly watch the flames, is frightening. We do not question the power of the State to deal with such a contingency."

On this issue the plaintiffs fare no better under West Virginia law than they do under pronouncements in the federal area. The opinions of several Attorneys General of this State have consistently stated that public employees in West Virginia have neither the right of

collective bargaining nor the right to strike. See Opinion of the Attorney General, Vol. 49, pages 448 and 452, and Vol. 51, page 683. Plaintiffs, however, argue that since there is no express legislative proscription in West Virginia against strikes by public employees and no decisional law by our Supreme Court of Appeals on this point, we are confronted with a situation analagous to the application of the *Erie* doctrine in diversity cases; that in the absence of an applicable statute or judicial precedent it is an "open" question and "may be resolved for the first time" by this court.

The answer to this somewhat novel argument is to be found in Article 8, Section 21 of the West Virginia Constitution which makes the "common law" the law of this State except as changed by the State Constitution and Acts of the Legislature. It is axiomatic that a strike by public employees for any purpose is illegal under the common law, and no statutory declaration of their illegality is necessary. In considering this question for the first time in the case of Board of Education of Community Unit School Dist. No. 2 v. Redding, 32 Ill.2d 567, 207 N.E.2d 427 (Ill.1965), the Supreme Court of Illinois made this observation (207 N.E.2d at 430):

> "Although this is a case of first impression in a reviewing court of this jurisdiction, it is, so far as we can ascertain, the universal view that there is no inherent right in municipal employees to strike against their governmental employer, whether Federal, State, or a political subdivision thereof, and that a strike of municipal employees for any purpose is illegal."

The rationale of this principle of the common law was bluntly stated in City of Cleveland v. Division 268, etc., 90 N.E.2d 711 (Ohio Com.Pl. 1949), " * * a strike against the public, a strike of public employees, has been denominated * * *, as a rebellion against government."

Through the years, not only the courts but statesmen and commentators have stated that to permit a strike by public employees at any level is inconsistent with the orderly processes and sovereignty of government:

> "Under our system, the government is established by and run for all of the people, not for the benefit of any person or group. The profit motive, inherent in the principle of free enterprise, is absent. It should be the aim of every employee of the government to do his or her part to make it function as efficiently and economically as possible. The drastic remedy of the organized strike to enforce the demands of unions of government employees is in direct contravention of this principle. It has been so regarded by the heads of the executive departments of the states and the nation. Most of the text writers refer to one or more of the following statements by three of our recent presidents. They are quoted, for example, in 1 Labor Law Journal 612 (May, 1950): 'There is no right to strike against public safety by anybody anywhere at any time' (Calvin Coolidge on the Boston police strike). This same strike was characterized by President Wilson as 'an intolerable crime against civilization.' President Franklin D. Roosevelt said in a letter to the president of the National Federation of Federal Employees on August 16, 1937: 'Particularly, I want to emphasize my conviction that militant tactics have no place in the functions of any organization of Government employees. * * [A] strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable.' As the author of the article cited says, 'The above statement by President Roosevelt, who certainly was no enemy of labor unions, epitomizes the answer to the problem. It seems to be axiomatic.'

"The commentators, generally, subscribe to this proposition. National Institute of Municipal Law Officers Reports No. 76, 116, 129; 1 Teller, Labor Disputes & Collective Bargaining (1947 Sup.) § 171; 18 N.Y.U.L.Q. Rev. 247; 94 U. of Pa.L.Rev. 427."

Norwalk Teachers' Assn. v. Board of Education, 138 Conn. 269, 83 A.2d 482 at 484, 31 A.L.R.2d 1133 (Conn. 1951).

■ When the plaintiffs and other employees of the Road Commission initiated their work stoppage on March 3, 1969, they were engaged in an illegal strike against the sovereign State of West Virginia and they continued in that posture up to the date of their discharge on March 11, 1969. Under these circumstances, the Governor and the State Road Commissioner had the right, if not indeed the responsibility, to terminate the plaintiffs' employment with the State. This action by the defendants, Moore and Ritchie, not only comported with the law of the State, but it violated no federal constitutional rights of the employees so discharged.

■ The plaintiffs argue that the Governor exceeded his authority when he discharged the Road Commission employees since Chapter 17, Article 2A, Section 4, of the West Virginia Code places responsibility for employment of Commission personnel upon the State Road Commissioner. Section 5 of Article VII of the State Constitution vests the chief executive power in the Governor and Section 18 of the same Article requires all officers of the Executive Department to keep the Governor advised of their activities. The Road Commissioner serves at the will and pleasure of the Governor and the record clearly shows that the decision to discharge the plaintiff-employees was reached after the Governor and Commissioner Ritchie had conferred about the gravity of the situation. Under these circumstances what possible difference should it make that the public announcement of the discharge was made by the Governor instead of the Commissioner—the answer obviously is none.

■ The plaintiffs further contend that their discharge was effected in disregard of their rights of procedural due process, including the right of formal notice and a hearing upon the reasons for termination of their employment. On the facts here present this contention is patently lacking in merit. The plaintiffs and other striking employees were absent from their jobs, had refused to return to work and well knew when and for what reason they were fired. Under these circumstances if the plaintiffs had any rights to procedural due process, they forfeited such rights through their own misconduct. Years ago in Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909), Mr. Justice Holmes said " * * * it is familiar that what is due process of law depends on circumstances. It varies with the subject-matter and the necessities of the situation." Assuredly, the formalities of procedural due process were neither appropriate nor practicable in the light of the situation which existed in West Virginia on March 11, 1969.

■ Additionally, however, the plaintiffs' employment by the State was not "property" and was not protected by the due process clause. This principle has been uniformly recognized by the courts. See Cafeteria and Restaurant Workers Union Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Jenson v. Olsen, 353 F.2d 825 (8th Cir. 1965); and Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46 (1950). In the last cited case the Court stated (182 F.2d at 58):

"No function is more completely internal to a branch of government than the selection and retention or dismissal of its employees. * * *

"In the absence of statute or ancient custom to the contrary, executive offices are held at the will of the appointing authority, not for life or for

fixed terms. If removal be at will, of what purpose would process be? To hold office at the will of a superior and to be removable therefrom only by constitutional due process of law are opposite and inherently conflicting ideas. Due process of law is not applicable unless one is being deprived of something to which he has a right."

The plaintiffs were employed in a classification which was not covered by the West Virginia Civil Service Act and accordingly they had no job tenure under the law of this State. Their argument that this exclusion from the Civil Service statute violates the equal protection clause of the 14th amendment has been rejected in a number of cases. See Ricks v. Department of State Civil Service, 200 La. 341, 8 So.2d 49 (1942); State ex. inf. McKittrick ex rel. Ham v. Kirby, 349 Mo. 988, 163 S.W.2d 990 (Mo. 1946) and Shelby v. City of Pensacola, 112 Fla. 584, 151 So. 53 (Fla.1933). The exclusion of the plaintiffs' job classifications from Civil Service coverage involved no invidious discrimination but was the result of legislative choice. In this context the Court in the *Shelby* case observed:

"[T]here is nothing in either the state or Federal Constitutions to make a discrimination of this kind violative of the organic law, however unfair and unjust as it may be as a matter of legislative policy."

■■■ In addition to the foregoing, it would appear that the plaintiffs in this case are confronted by the insuperable barrier of the 11th amendment since it is now well settled that under the amendment a state is immune from suit in a federal court by its own citizens. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842. Whether the action is a suit against a state within the meaning of the amendment is to be determined by the character of the proceeding and the relief sought rather than the mere names of the titular parties to the litigation. Ex parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057; Louisiana ex rel. Elliott v. Jumel, 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448.

■■■ In the complaint in this case the plaintiffs ask to be reinstated as employees of the State; a money judgment for loss of income; a mandatory injunction requiring the Road Commissioner to consider their grievances as employees of the State; and an injunction against certain alleged discriminatory State employment practices. The thrust of the relief sought is directed at the State of West Virginia and could be granted only by requiring the nominal defendants, as officers of the State, to take affirmative action to provide such relief. Thus it is clear that the State is the real party in interest and the 11th amendment immunity bars any consideraction of the complaint in this court. The law relative to the State's immunity in such a case was clearly stated in Hagood v. Southern, 117 U.S. 52, at 67, 6 S.Ct. 608, at 615, 29 L.Ed. 805:

"Though not nominally a party to the record, it is the real and only party in interest, the nominal defendants being the officers and agents of the state, having no personal interest in the subject-matter of the suit, and defending only as representing the state. And the things required by the decrees to be done and performed by them are the very things which, when done and performed, constitute a performance of the alleged contract by the state. The state is not only the real party to the controversy, but the real party against which relief is sought by the suit, and the suit is therefore substantially within the prohibition of the eleventh amendment to the constitution of the United States, * * *.

"The case comes thus directly within the authority of Louisiana [ex rel. Elliott] v. Jumel, 107 U.S. 711, 2 S.Ct. 128."

The Supreme Court has made it clear that it is cases such as the present one where the relief requested will require

affirmative action by the sovereign that fall within the jurisdictional prohibition of the 11th amendment. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; Pennoyer v. McConnaughy, 140 U.S. 1, 11 S.Ct. 699, 35 L.Ed. 363; North Carolina v. Temple, 134 U.S. 22, 10 S.Ct. 509, 33 L.Ed. 849; James v. Almond, 170 F.Supp. 331 (E.D.Va.1959).

Finally, in regard to the alleged liability of the defendants in their individual capacity for damages in an action under 42 U.S.C. § 1983, the recent Fifth Circuit opinion in Martone v. McKeithen, 413 F.2d 1373 (1969) stated the law clearly and succinctly:

"A. The Governor of the State has immunity from damage suits for acts within the sphere of executive activity. Barr v. Matteo, 1959, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Gregoire v. Biddle, 2 Cir. 1949, 177 F.2d 579; Norton v. McShane, 5 Cir. 1964, 332 F.2d 855. As Judge Learned Hand said in Gregoire v. Biddle, 177 F.2d at 851: 'The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.'"

In the light of the foregoing observations, it is my conclusion that the complaint herein fails to state a claim against the defendants, either individually or in their respective official capacities, upon which relief could appropriately be granted, and I further conclude that this Court lacks jurisdiction of the subject matter. Accordingly, the several dismissal motions will be granted and counsel may prepare an appropriate order, incorporating this opinion by reference therein.