283 S.E.2d 589 (1980)
CITY OF FAIRMONT, a municipal corporation, doing business as Fairmont General Hospital
v.
RETAIL, WHOLESALE, AND DEPARTMENT STORE UNION, AFL-CIO, et al.
No. CC911.
Supreme Court of Appeals of West Virginia.
October 21, 1980.
Concurring Opinion June 18, 1981.
*590 Furbee, Amos, Webb & Critchfield and Stephen R. Brooks, Fairmont, Thorp, Reed & Armstrong, Charles R. Volk and Martin J. Saunders, Pittsburgh, Pa., for plaintiff.
Grant F. Crandall, Bradley J. Pyles, Logan and Robert Poyourow, Charleston, for defendants.
McIntyre, Haviland & Jordan, James B. McIntyre and James M. Haviland, Charleston, for amicus curiae  W.Va. Labor Federation, AFL-CIO and Certain Locals of American Federation of Teachers, AFL-CIO.
MILLER, Justice.
The Circuit Court of Marion County determined that upon the limited facts presented to it through pleadings, affidavits and a summary judgment hearing that a peaceful strike by employees of a municipal hospital did not give rise to a cause of action for damages against certain labor unions. It thereupon certified its rulings to this Court under the provisions of W.Va. Code, 58-5-2. The certified questions are set out in the margin.[1] For reasons more fully stated herein, we decline to address the certified questions in the precise manner in which they are formulated to us since we believe there is some redundancy in the legal questions posed. Two basic questions are posed. First, whether as a matter of law the facts present a substantive cause of action for damages. Second, whether a labor union may be sued as an entity. We have traditionally maintained that upon receiving certified questions we retain some flexibility in determining how and to what extent they will be answered. West Virginia *591 Water Service Co. v. Cunningham, 143 W.Va. 1, 98 S.E.2d 891 (1957).
Because the issues involved in this case are matters of substantial public importance, and because in this area of labor law there is a critical necessity for precise delineation of the operative facts, it is important to summarize the key factual events upon which this opinion is predicated.

I. The Operative Facts

The City of Fairmont as a municipal corporation operates a hospital known as the Fairmont General Hospital. Prior to the filing of the complaint on September 11, 1978, the hospital had entered into a collective bargaining agreement with the Retail, Wholesale and Department Store Union, AFL-CIO, and its Local 550. This collective bargaining agreement covered a three-year period from March 2, 1977, to March 2, 1980. The employees included in the bargaining unit were non-professional maintenance employees. Included within this collective bargaining agreement was a provision that:
"The union agrees that for the duration of this contract it will not attempt to organize, admit to membership or represent any employees not currently included in the above bargaining unit."
Sometime in August, 1978, the hospital learned that a number of its nursing staff, as well as certain other technical employees, desired to organize collectively and be represented by Local 1199 of the National Union of Hospital and Health Care Employees, which is also a member of the AFL-CIO. There was apparently some confusion on the part of the hospital as to whether Local 1199 of the Hospital and Health Care Employees was in fact representing the nurses or whether it was Local 550 of the Retail, Wholesale and Department Store Union, which had agreed under the collective bargaining agreement not to expand its bargaining unit. Part of this confusion was engendered by the fact that both locals had utilized the same business agent, the defendant Tom Woodruff.
Correspondence and telegrams were exchanged between the hospital and Mr. Woodruff, and it was the latter's position that the nurses were being represented by Local 1199 of the Hospital and Health Care Union. Several nurses, together with Mr. Woodruff, made abortive attempts to discuss the union's representation with the hospital administrative staff and to present to the hospital management a petition signed by 156 nurses affirming their desire to have Local 1199 act as their bargaining agent.
When the hospital refused to meet with nursing representatives and Mr. Woodruff, it was advised that by vote of 145 to 9 the nurses and other technical employees would on September 11, 1978, refuse to work. The involved employees offered to set up an emergency care committee; however, the hospital management declined this offer and made arrangements to close the hospital facility except for emergency and out-patient services.
The work stoppage occurred on September 11, 1978, and was accompanied by informational picketing at the situs of the hospital. The picketing was peaceful and nonobstructive to other hospital employees. The hospital initially sought a temporary injunction but this was declined by the Circuit Court of Marion County.
Thereafter, the case proceeded on the question of whether the hospital could collect damages as a result of the work stoppage from the various defendants, who were the Retail, Wholesale and Department Store Union, AFL-CIO; Local 550, Retail Wholesale and Department Store Union, AFL-CIO; Local 1199, National Union of Hospital and Health Care Employees; Tom Woodruff; Buhl Tennant; John Doe; and Jane Doe. The hospital asserted that it had a cause of action for damages based on the fact that the work stoppage constituted a tortious interference with its business relations or was a public nuisance in view of the fact that a public employees' strike is illegal. The trial court declined to give damages, holding as a matter of law that a peaceful strike by employees under the facts of this case did not give rise to a cause *592 of action for damages. It also concluded that from a procedural standpoint the various union defendants could not be sued as entities.

II. The Common Law Right To Damages

The hospital asserts the broad proposition that since it is generally held that public employees have no right to strike, that it follows that such a strike is illegal and as a consequence it may recover damages as a result of the strike.[2] We do not agree with this reasoning. Whether there is a right to sue for damages in this case will depend upon common law labor principles.[3]
In Krystad v. Lau, 65 Wash.2d 827, 400 P.2d 72 (1965), the Washington Supreme Court, sitting en banc, made a rather exhaustive analysis of the common law surrounding labor unions and took particular pains to point out that in general American courts have not followed the English common law surrounding the suppression of labor unions:
"American courts gave scant heed to the common-law rules for the suppression of labor unions. Only two states of the United States seem to have accepted the curious view that a combination of workmen to raise wages constituted a criminal conspiracy. People v. Melvin, 2 Wheeler's Crim.Cases 262 (New York, 1810); People v. Trequier, 1 Wheeler's Crim.Cases 142 (New York, 1823); Philadelphia's Cordwainers' Case (Pennsylvania, 1805), reported 41 Yale L.Jour. 165 (1931). Despite dicta to the contrary, the idea that a labor union is a criminal conspiracy seems not to have taken root in this country. Witte, Early American Labor Cases, 35 Yale L.Jour. 825 (1926); Nelles, The First American Labor Case, 41 Yale L.Jour. 165 (1931). Any lingering doubts that the roots of the idea were shallow indeed, if they can be said to have taken hold at all in American law, may be put to rest by a reading of Commonwealth v. Hunt, 45 Mass. (4 Metcalf) 111, 38 Am.Dec. 346 (1842), a landmark in the field of labor law, and quite possibly the foundation upon which the American law of labor unions is built." (65 Wash.2d at 835, 400 P.2d at 77)[4]
Commonwealth v. Hunt, 45 Mass. (4 Met.) 111, 134 (1842), cited in Krystad, contains these statements which in effect test the lawfulness of a union's conduct as reflected by its activities:
"[A]ssociations may be entered into, the object of which is to adopt measures that may have a tendency to impoverish another, *593 that is, to diminish his gains and profits, and yet so far from being criminal or unlawful, the object may be highly meritorious and public spirited. The legality of such an association will therefore depend upon the means to be used for its accomplishment. If it is to be carried into effect by fair or honorable and lawful means, it is, to say the least, innocent; if by falsehood or force, it may be stamped with the character of conspiracy.... if criminal and indictable, it is so by reason of the criminal means intended to be employed for its accomplishment; and as a further legal consequence, ... those means must be stated in the indictment."
We have made much the same point in Parker Paint & Wall Paper Co. v. Local Union No. 813, 87 W.Va. 631, 642, 105 S.E. 911, 915 (1921), where we quoted with approval the following statement from Pierce v. Stablemen's Union, 156 Cal. 70, 76, 103 P. 324, 327 (1909):
"A body of workmen are dissatisfied with the terms of their employment. They seek to compel their employer to come to their terms by striking. They may legally do so. The loss and inconvenience he suffers he cannot complain of. But when they seek to compel third persons, who have no quarrel with their employer, to withdraw from all association with him by threats that unless such third persons do so the workmen will inflict similar injury on such third persons, the combination is oppressive, involves duress, and, if injury results, it is actionable."[5]
In United Maintenance and Manufacturing Co., Inc. v. United Steelworkers of America, Inc., 157 W.Va. 788, 204 S.E.2d 76 (1974), and Ohio Valley Advertising Corp. v. Union Local 207, 138 W.Va. 355, 76 S.E.2d 113 (1953), we recognized that since Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), there exists under the First Amendment a constitutionally protected right of association and free expression for employees who are in a union or desire to join one.
Admittedly, the foregoing opinions involved union activity in the private sector. In Smith v. Arkansas State Highway Employees, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979), however, the court recognized that public employees do enjoy some First Amendment rights in regard to their organizational attempts:
"The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so. See Pickering v. Board of Education, 391 U.S. 563, 574-575, 88 S.Ct. 1731 [1737-1738], 20 L.Ed.2d 811 (1968); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). But the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it." (441 U.S. at 465, 99 S.Ct. at 1828, 60 L.Ed.2d at 363) (footnote omitted)
Thus, while some constitutional protection is extended under the First Amendment to public employees to organize, speak freely and petition, it is clear that a public employer is not required to recognize or bargain with a public employee association or union in the absence of a statutory requirement. These decisions, however, do not resolve the question presented in this case. Oddly enough there are few decisions that address the precise issue before us, whether a common law cause of action exists for damages arising from a peaceful work stoppage against the employer by *594 public employees. In the leading case of Lamphere Schools v. Lamphere Federation of Teachers, 400 Mich. 104, 252 N.W.2d 818 (1977), the Supreme Court of Michigan found no common law right and declined to create a common law remedy for damages against a teacher's union for a peaceful work stoppage:
"The proposed remedies in tort which the School District asserts, in the case at bar, are heretofore unknown to the Michigan common law. Although couching its cause in such familiar tort terms as `causing a breach of a common law and statutory duty', `intentional interference with individual contractual relationships' and `civil conspiracy', the School District attempts to recover monetary damages from teacher federations for conduct not presently actionable, to wit: the withholding of services through peaceful concerted action of public employees. [footnote omitted]
"Plaintiff School District fails to cite to this Court any prior case in this jurisdiction which has considered the instant question under any tort theory. Moreover, in other states which have statutes prohibiting public employee strikes, the principle permitting a cause of action in tort for damages has not been judicially adopted. [Citing Annot., 37 A.L.R.3d 1147 (1971), in a footnote.]
* * * * * *
"In no manner does the Detroit case or any known Michigan case even suggest that monetary damages can be obtained by a school district from the teachers or the teachers' federation under any theory, in the event of a peaceful strike. There has been no case which would support the contention that there is a common law tort of `public teacher strikes' with an attendant remedy. On the contrary, there is a total absence of any such preexistent common law remedy." (400 Mich. at 124-29, 252 N.W.2d at 827-29)
The only other decision that has a bearing on this issue is Pasadena Unified School District v. Pasadena Federation of Teachers, 72 Cal.App.3d 100, 140 Cal.Rptr. 41 (1977), where the court reversed the dismissal of the School District's complaint which sought damages for breach of contract. The reversal was predicated on the existence of written employment contracts between the teachers and the school district. The teachers had engaged in a work stoppage during the school year while they were under contract. Here there are no written employment contracts which are alleged to have been breached.
We have not been cited any case where a court has held that a peaceful strike by public employees under the conditions existing in this case gives rise to a damage action.[6] The assertion that the strike is "illegal" only serves to confuse the issue. The term "illegal" in the present case is much like the term "unfair," which concerned this Court in the Ohio Valley Advertising case, supra. Its meaning must be derived from the context in which it is used.[7] Here we consider the term "illegal" against the narrow band of common law *595 labor principles where damages are sought for a peaceful strike. We conclude that where public employees who have no employment contracts with their employer, engage in a work stoppage which is peaceful and directed only against the employer with no attempt to interfere with his customers or bar ingress to other employees there is no common law right to damages. In this context, the work stoppage is not "illegal" in the sense that it gives rise to a common law action for damages. We, also, adopt the view of the Michigan Supreme Court in Lamphere and decline to judicially extend under our common law powers a remedy for damages. See Morningstar v. Black & Decker Manufacturing Co., W.Va., 253 S.E.2d 666 (1979).
In so declining, we note that in most other states the legislature has made an effort to make some statutory accommodations to the labor relation problems that exist in the public sector. Indeed, it was the initial inability of the courts to judicially resolve the competing interests of private employees and private employers that led to federal legislation in the labor law field. Most if not all commentators in the labor law area agree that the complex issues in this field are ill suited to any comprehensive judicial solution.[8]

III. Suability of Labor Union As An Entity

A further issue raised by the certification is whether from a procedural standpoint an unincorporated labor association can be sued as an entity. Both parties recognize that this issue was addressed in State ex rel. Glass Blowers Association v. Silver, 151 W.Va. 749, 155 S.E.2d 564 (1967), where we made the following statement in Syllabus Point 2:
"In the absence of a statute or rule of practice authorizing such procedure, an unincorporated society or association can not be sued as an entity by its name, nor can judgment be rendered against it merely by name; but to confer jurisdiction, the members composing the association, or some of them, must be named as parties and process served upon them individually."
Much the same point has been made in our earlier decisions. West Virginia Secondary School Activities Commission v. Wagner, 143 W.Va. 508, 102 S.E.2d 901 (1958); Milam v. Settle, 127 W.Va. 271, 32 S.E.2d 269 (1944); West v. Baltimore and Ohio Railroad Company, 103 W.Va. 417, 137 S.E. 654 (1927).
Some courts have adopted the extreme view that a voluntary organization cannot be sued unless all of its members are joined as parties. E. g. American Federation of Technical Engineers, Local 144 v. LaJeunesse, 63 Ill.2d 263, 347 N.E.2d 712 (1976); All Members of the AFL-CIO Building Trade Council v. Yost Construction Company, Inc., 144 Ind.App. 433, 246 N.E.2d 771 (1969). However, as we have stated in Silver, supra, we permit the suit against an unincorporated association by joining a representative group of its members. This appears to be the more enlightened rule. E. g. McCormack v. Labor Relations Commission, 358 Mass. 682, 266 N.E.2d 651 (1971); 6 Am.Jur.2d Associations and Clubs §§ 54 & 55 (1963); Annot., 92 A.L.R.2d 499 (1963).[9]
*596 We recognize, as we did in Milam, supra, that United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922) altered the federal procedural law to permit a suit against a labor union as an entity, where the suit seeks to enforce a federal substantive right. Milam noted that the federal alteration "is based largely, although not wholly, on the Federal statutes relating to subjects in which unincorporated associations such as labor unions play an important part." (127 W.Va. at 283, 32 S.E.2d at 274.)
Based on Coronado Coal, supra, Rule 17(b) of the Federal Rules of Civil Procedure was enacted, which permits suits against an unincorporated association as an entity where the suit enforces a federal substantive right. 3A Moore's Federal Practice ¶ 17.25.[10] However, we have no counterpart to Rule 17(b) in the West Virginia Rules of Civil Procedure. This lack of a Rule 17(b) in our Rules of Procedure is a further indication that our case law remains intact.
The hospital argues that as a result of the enactment in 1971 of W.Va.Code, 21-1A-1 et seq., entitled "Labor-Management Relations Act For The Private Sector" that the Legislature intended to permit labor unions to be sued as an entity. This argument is based on the language contained in W.Va. Code, 21-1A-7.[11] Particular emphasis is placed on W.Va.Code, 21-1A-7(c) which states that "any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents."
It must be kept in mind that while this act was patterned from the National Labor Relations Act, 29 U.S.C.A. § 141 et seq., as indicated by W.Va.Code, 21-1A-1(c),[12] but the National Labor Relations Act does not contain a provision similar to W.Va.Code, *597 21-1A-7.[13] Thus, cases decided under the National Labor Relations Act are of no help in construing W.Va.Code, 21-1A-7.
There is no question that W.Va.Code, 21-1A-1 et seq., is limited to private sector labor disputes. Under W.Va.Code, 21-1A-2(a)(2), there is excluded from the term "employer" the following:
"... [T]he State of West Virginia or any political subdivision or agency thereof, or any corporation or association operating a hospital, if no part of the net earnings innures to the benefit of any private shareholder or individual."
The result of the foregoing provisions is to remove public labor disputes from the purview of the act. From this it must follow that the procedural changes brought about by W.Va.Code, 21-1A-7, are applicable only to parties and disputes covered by the act and cannot be construed to have changed our settled common law in regard to the suability of labor unions that are outside the ambit of the act. We have consistently held that statutes which alter the common law are narrowly construed and will not be extended beyond the clear legislative intent. Fruehauf Corporation v. Huntington Moving & Storage Co., W.Va., 217 S.E.2d 907 (1975). In Syllabus Point 3 of Bank of Weston v. Thomas, 75 W.Va. 321, 83 S.E. 985 (1914), we stated:
"Statutes in derogation of the common law are allowed effect only to the extent clearly indicated by the terms used. Nothing can be added otherwise than by necessary implication arising from such terms."
See also Carbide & Carbon Corp. v. Linville, 142 W.Va. 160, 95 S.E.2d 54 (1956); Shifflette v. Lilly, 130 W.Va. 297, 43 S.E.2d 289 (1947).
Returning to the certified questions set out in Note 1, we conclude that under the facts of this case, questions 1 through 4 must be answered in the negative since the strike was not "illegal" in the sense that it gave rise to a common law action for damages. Certified question number five is also answered in the negative. These answers are consistent with the trial court's rulings and, therefore, we affirm its rulings.
Rulings On Certified Questions Affirmed
NEELY, C. J., dissents.
McGRAW, Justice, concurring:
I concur with the majority in its conclusion that a peaceful strike by public employees is legal in West Virginia. My concern grows from the implication in syllabus point 2 that public employees' First Amendment rights are something less than the rights of other citizens, and that public officers have no duty to respond to the grievances of public employees.
In syllabus point 2, the majority seems to confuse the rights of public employees with the duties of public employers. It says "[w]hile some constitutional protection is extended under the First Amendment to public employees, [public employers have no duty to recognize or bargain with a public employee union]." The implication is that public employers not only do not have to bargain with public employees, but that public employees have only an ill-defined, but somehow limited First Amendment protection.
Both public and private employees derive their organizational rights from the First Amendment. For example, in defense of the constitutionality of the collective bargaining provisions of the National Labor Relations Act, 29 U.S.C. § 151 et seq., the United States Supreme Court in NLRB v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), stated: "the statute goes no further than to safeguard the right of employees to self-organization and to select representatives of *598 their own choosing for collective bargaining and other mutual protection without restraint or coercion by their employer. That is a fundamental right". 301 U.S. at 33, 57 S.Ct. at 622, 81 L.Ed. at 909.
The rights to which the Court here alludes are in no sense "created" by federal labor legislation, but predate the NLRA proceeding from the Constitution itself. United States v. Bailes, 120 F.Supp. 614 (S.D.W.Va.1954). Thus, in NLRB v. Jones & Laughlin, supra, the Court concluded that Congress had previously recognized the legality of collective action and was constitutionally empowered to safeguard it. In Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940), the Court likewise stated:
Neither [§ 7 of the NLRA], nor any other provision of the Act can properly be said to have "created" the right of self-organization or of collective bargaining through representatives of the employees own choosing. In NLRB v. Jones and Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615 [81 L.Ed. 893], we observed that this right is a fundamental one, that employees have as clear a right to organize and select their representatives for lawful purposes as the employer has to organize its business and select its own officers and agents. 309 U.S. at 263, 60 S.Ct. at 562-63, 84 L.Ed. at 741.
Our United States Supreme Court has noted that Congress also recognized the strike to be an expression of the fundamental right to organize and engage in concerted activities for mutual aid and protection. Amalgamated Association of Street, Elec. Ry & Motor C. Employees v. Wisc. Empl. Relations Bd., Ftn. 8; 340 U.S. 383, 389; 71 S.Ct. 359, 363, 95 L.Ed. 364, 373 (1951).
Moreover, as our United States Supreme Court has held, public employment may not be "conditioned upon the surrender of constitutional rights which could not be abridged by direct government action". Keyishian v. The Board of Regents of the University of the State of New York, 385 U.S. 589, 605, 87 S.Ct. 675, 685, 17 L.Ed.2d 629, 642 (1967). See also, Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The Keyishian analysis was subsequently supported in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), where the government was prevented from denying a benefit to a person on a basis that infringes his constitutionally protected interests  especially his interests in freedom of speech.
For if the government could deny a benefit to a person because of his constitutionally protected speech, or associations, his exercises of those freedoms would in effect be penalized and prohibited. This would allow the government to produce a result which [it] could not command directly.... Such interference with constitutional rights is impermissible. (Citations omitted), 408 U.S. at 597, 92 S.Ct. at 2697, 33 L.Ed.2d at 577.
Reputable courts have clearly recognized that public employees, as a class, have a constitutionally protected right under the First Amendment to the United States Constitution, as do other first class citizens, to associate with others in a labor organization whose purpose is to attempt to negotiate terms and conditions of employment with their employer. Lontine v. Van Cleave, 483 F.2d 966 (10th Cir. 1973); Orr v. Thorpe, 427 F.2d 1129 (5th Cir. 1970); American Federation of State, County and Municipal Employees, AFL-CIO v. Woodward, 406 F.2d 137 (8th Cir. 1969); McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968); Melton v. City of Atlanta, 324 F.Supp. 315 (N.D.Ga.1971); Hanover Township Federation of Teachers v. Hanover Community School Corporation, 318 F.Supp. 757 (N.D. Ind.1970), aff'd, 457 F.2d 456 (7th Cir. 1972); Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.N.C.1968). The case of Atkins v. City of Charlotte, supra, is often cited as one of the first public employee cases to fully recognize the associational protections accorded to public employees. In Atkins, the court stated at page 1075; "we think there is no valid State interest in denying firemen the right to organize a labor union. It is beyond argument that a *599 single individual can not negotiate on a equal basis with an employer who hires hundreds of people."
The rights of speech, association, and assembly intertwine in the union context. If "membership" is the aggregate expression of those rights, then membership is likewise protected. "The guarantee of the `right of assembly' protects more than the right to attend a meeting, but includes the right to express one's attitude or philosophies by membership in a group or by affiliation with it or by other lawful means." A.F.S.C. M.E., AFL-CIO v. Woodward, 406 F.2d 137, 139 (8th Cir. 1969).
Freedom of speech is specifically protected. Citizens may engage in speech critical of their government employer or antagonistic to the sovereign generally. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1969); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). Leafletting and picketing are constitutionally protected speech. Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1935); Consolidated Coal Co. v. Disabled Miners of Southern West Virginia, 442 F.2d 1261, 1266 (4th Cir. 1971); cert. denied 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971); Blossom Dairy v. Teamsters, 125 W.Va. 165, 23 S.E.2d 645 (1942). W.Va.Const. art. 3, § 7.
The right of the people to assemble and to apply for a redress of grievances is also specifically protected. Application for redress may be made to any level or agency of government. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). W.Va.Const. art. 3, § 16.
Thus, we see that the First Amendment rights of public employees are as great as the rights of employees in the private sector. The majority surely could not mean that public employees have only "some" First Amendment protection. More probably, they "really" mean to say that public employees have the same constitutional rights as private employees, but unlike private employers governed by the NLRA, public employers are not statutorily charged by legislative enactment with a duty to deal fairly with public workers.
In West Virginia the right to protest against the policies of government and the right to seek redress from the government without fear of reprisal are as fundamental to our law and good sense as "cornbread and beans" are to our diet.
The second part of the syllabus point is overly broad in suggesting that the public employer has no duty to listen to the grievances of its employees. The majority relies on Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979), for the proposition that there is no duty to bargain imposed upon the state employer. In Arkansas, the Court held that the right of highway department employees to organize and petition their employer was protected by the First and Fourteenth Amendments to the United States Constitution. However, the Court noted that the employer had the right to refuse to consider or act upon the request of the employees. While pointing out that the State's conduct in refusing to deal with the union, if done by a private employer, would likely violate federal labor law, the court stated that, "the First Amendment does not impose any affirmative obligation on the government to listen, to respond, or, in this context, to recognize the association and bargain with it." 441 U.S. at 465, 99 S.Ct. at 1828, 60 L.Ed.2d at 363. See also, Pickering v. Board of Education, 391 U.S. 563, 574-75, 88 S.Ct. 1731, 1737-38, 20 L.Ed.2d 811 (1969); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).
This statement from Arkansas may be the law there, but it is not the law in West Virginia. Our Bill of Rights, memorialized in our Constitution, not only guarantees the right of redress, it imposes upon public officers a duty to respond to public grievances. W.Va.Const. art. III, §§ 1, 2 and 3. Section two reads: "All power is vested in, and consequently derived from, the people. Magistrates are their trustees and servants, and at all times amenable to them." A dispute concerning the conditions of public *600 employment is clearly a public grievance cognizable by the government under our Bill of Rights.
There is an even more compelling reason why the State should address the grievances of its employees: the concept of fair dealing between people. In the private sector, the government created the NLRA in an attempt to remove the coercive bargaining tactics used by employers in their pursuit of lucre. In so doing, it recognized the evils of a system based on the "take-it-or-leave-it" philosphy of management-labor relations. As part of the remedy, certain rules were laid down which have the effect of balancing the parties' positions and encouraging a free exchange between management and labor. To say that the State is exempt from fair dealing is to allow the State to practice labor tactics as unfair as the type of tactics Congress outlawed under the NLRA. The State should be an example of highest order in regard to dealing fairly with workers. Failure of the government to treat working people fairly is not only unseeming and reprehensible, it is, in the religious community, held to be immoral. The church, speaking from a Biblical and theological foundation, prayerfully and thoughtfully instructs that Christians, in their duty, should support the right of public employees and employers to organize into unions and support their right to protection in doing so. See, e. g., Social Principles of the United Methodist Church, adopted by the 1976 and 1980 General Conferences of the United Methodist Church. Board of Church and Society, 100 Maryland Ave. N.E., Washington, D.C. 20002.
I see no reason why a public employee should be treated differently from a private employee. To say that the difference is that public employees' jobs are essential to the maintenance of the State is to ignore the fact that the State is involved in myriad proprietory functions quite like the private sector's functions. In this jurisdiction, private enterprise manages energy and the State sells liquor. Which is more essential? The answer is obvious, but employees of one can bargain with their employer and employees of the other cannot. Reputable jurisprudence will not sanction such inequity. Finally, of course, neither will the majority.
Chief Justice HARSHBARGER authorizes me to say that he joins in this concurrence.
NOTES
[1] "If a peaceful strike by employees of a municipal hospital is illegal under West Virginia law."
2. "If a peaceful strike by employees of a municipal hospital is illegal under West Virginia law whether such a strike automatically gives rise to a cause of action for damages incurred thereby in favor of the struck municipal hospital and against the union and/or its agent who aids, abets or fosters the strike."
3. "If a peaceful strike by employees of a municipal hospital is illegal under West Virginia law whether such a strike gives rise to a cause of action for damages incurred thereby in favor of the struck municipal hospital and against the union and/or its agent who aids, abets or fosters the strike on the theory of the strike being a tortious public nuisance."
4. "If a peaceful strike by employees of a municipal hospital is illegal under West Virginia law whether such a strike may give rise to a cause of action for damages incurred thereby in favor of the struck municipal hospital and against the union and/or its agent who aids, abets or fosters the strike on the theory of the strike being a tortious interference with the business relationships of the municipal hospital."
5. "Whether any action for damages may be maintained against an unincorporated labor union of municipal hospital employees as an entity under West Virginia law."
[2] Most cases involving public employee strikes have arisen in the context of an injunction. Annot., 37 A.L.R.3d 1147 (1971). This issue is not presented in this case nor is the related issue of the right to discharge public employees who have engaged in a strike. Kirker v. Moore, 308 F.Supp. 615 (S.D.W.Va.1970), aff'd, 436 F.2d 423 (4th Cir. 1970), cert. denied, 404 U.S. 824, 92 S.Ct. 49, 30 L.Ed.2d 51 (1971); cf., Olshock v. Village of Skokie, 541 F.2d 1254 (7th Cir. 1976).
[3] Federal labor law statutes are not applicable to state public employers, 29 U.S.C.A. § 152(2). Likewise, the "Labor-Management Relations Act for the Private Sector," W.Va.Code, 21-1A-1 et seq., is not applicable on the substantive cause of action for damages because of the exclusion of public employers. W.Va.Code, 21-1A-2(a)(2). We discuss in Section III, infra, the relation of this statute to the procedural question of the right to sue a labor organization as an entity.
[4] E. Witte in his article Early American Labor Cases in 35 Yale Law Journal 825, 836-37 (1926) demonstrates rather conclusively that American courts did not develop their labor law from English sources. His conclusions in this regard are:

"The development of the law of labor combinations in the United States has been very different from that of England. In England labor unions were in the early nineteenth century deemed to be illegal, even criminal combinations; and every act in furtherance of their objects was an indictable offense....
"In the United States, it was never generally accepted as law that labor unions are unlawful, although a few attempts were made to apply what was called the `common law' rule of the illegality of all combinations to raise wages. From the outset, the courts of this country generally accorded working-men the right to organize for their mutual economic betterment, and scrutinized only the measures they adopted to gain their ends."
Consequently, any attempt to utilize English common law cuts against the grain of our American labor law.
[5] In Annot., 36 A.L.R.3d 405, 408 (1971), the following general statement is made on the common law right to recover damages in the private sector:

"Although a labor union or its membership is not liable to persons who suffer financial losses as the result of peaceful and lawful labor activities, the courts have uniformly recognized that a labor union or its membership may be held liable, under general principles of agency law, for the common-law torts of its officers or members committed during the course of a lawful strike, or other primary labor activities, if the union officers or members authorized, participated in, or ratified the tortious acts." (footnote omitted)
[6] We are aware of two cases that peripherally touch this area. Olshock v. Village of Skokie, 541 F.2d 1254 (7th Cir. 1976), involved the dismissal of civil service police officers for an illegal strike. The court found that their discharge violated procedural due process, but offset their back-pay claims by damages incurred by the village as a result of the illegal strike. The offset was not extensively discussed nor couched in traditional tort-nuisance theories, but was based on equitable grounds not precisely articulated. Similarly, Caso v. District Council 37, 43 A.D.2d 159, 350 N.Y. S.2d 173 (1973), is not on point since it involved damages for a willful and malicious nuisance brought by officials of the County of Nassau against a New York City union whose members operated a sewage plant which discharged raw sewage on Nassau's beaches when the members engaged in a strike. No element of willful and malicious conduct is here asserted. See also Annot., 84 A.L.R.3d 336 (1978).
[7] This but echoes the thought better expressed by Justice Holmes in Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, 376 (1918):

"A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."
[8] A history of the problems and suggested legislative solutions are contained in the following commentaries: F. Frankfurter & N. Greene, Congressional Power Over The Labor Injunction, 31 Colum.L.Rev. 385 (1931) (regarding the need for federal legislation); C. Magruder, A Half Century of Legal Influence Upon The Development Of Collective Bargaining, 50 Harv.L. Rev. 1071 (1937) (tracing the development of congressional legislation in response to legal decisions on labor disputes); C. Kincaid, Resolving Public Employment Disputes: A Guide for West Virginia, 79 W.Va.L.Rev. 23 (1976) (containing a comprehensive summary of various theories and legislative solutions to public employee disputes along with numerous citations to pertinent articles and books).
[9] M. Forkosch, The Legal Status and Liability of Labor Organizations, 28 Temp.L.Q. 1, 2 (1954), indicates that the original common law theory, that unincorporated associations could only be sued by suing all members, was gradually modified by the equitable doctrine of permitting suits by and against a representative group of the association's members such as its officers and executive committee. For a comprehensive review of the law surrounding private associations, see Note Judicial Control of Actions of Private Associations, 76 Harv.L.Rev. 983 (1963).
[10] Rule 17(b) of the Federal Rules of Civil Procedure provides:

"CAPACITY TO SUE OR BE SUED. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C., §§ 754 and 959(a)."
This rule by its terms does not change the applicable state law, where the suit is not based on a federal right.
[11] W.Va.Code, 21-1A-7, in pertinent part, provides:

"(c) Any labor organization and any employer shall be bound by the acts of its agents. Notwithstanding any other provision of law or rule to the contrary, any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents. Any money judgment against a labor organization in a suit under this section shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.
"(d) For the purposes of actions and proceedings by or against labor organizations, the circuit courts of this State shall be deemed to have jurisdiction of a labor organization in the county in which such organization maintains its principal offices, or in any county in which its duly authorized officers or agents are engaged in representing or acting for employee members.
"(e) The service of summons, subpoena, or other legal process of any circuit court of this State upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization. (1971, c. 82.)"
[12] W.Va.Code 21-1A-1(c) states:

"This article is patterned after the provisions of the `National Labor Relations Act,' as amended, and except insofar as the provisions of this article differ from the provisions of said act, as amended, the decisions of the national labor relations board and of the courts with respect to said act, as amended, shall be authoritative in the interpretation, administration and application of the provisions of this article."
[13] The National Labor Relations Act vests primary jurisdiction over labor disputes, as defined in the Act, in the National Labor Relations Board and not the federal courts. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). We recognized this principle in United Maintenance and Manufacturing Co., Inc. v. United Steel Workers of America, 157 W.Va. 788, 204 S.E.2d 76 (1974).